778 A.2d 1162 (2001)
343 N.J. Super. 480
James J. SMITH and Sandra Smith; John F. Smith; Elizabeth A. Gorman; Alfia M. Hayes; Terrence M. Smith; T.S.; Steven M. Stolar; Steven Stolar; M.D.; J.F.D.; F.W.D.; R.M.B.; R.B.; Margaret Stanton; Diane Fetters-Murphy; Kathleen S. Palmer; Roxanne J. Angell and Troy A. Angell; Thomas Marshall; G.M.M.; Peter D. Pfister and Dorothy Pfister; R.I.N. and L.N.; Stephen M. Johnson; A.G.P.; G.P.; Roseann Piccioni; Denise Barcus, individually and as natural guardian for W.B., a minor; M.L., individually, and as parent and natural guardian for M.M., a minor; Linda Hegarty, individually, and as parent and natural guardian for E.H., a minor; Christine Pittman, individually, and as parent and natural guardian for S.P., a minor; Stephen Gandy; Robert Young; Philip Young; Joan Dougherty; and Gary Mauger, Plaintiffs, and
Melissa Marshall, Plaintiff-Appellant,
v.
ESTATE OF Rev. John P. KELLY, individually; Our Lady Star of the Sea Roman Catholic Church, a religious corporation; Rev. Msgr. Joseph A. von Hartleben, individually; Rev. Francis Gaffney, individually; Rev. *1163 Joseph Martelli, individually; Catholic Charities of the Diocese of Camden, a religious corporation; Msgr. Timothy A. Ryan, individually; Maryanne Canale, individually; Msgr. William J. Reynolds, individually; St. Raymond Roman Catholic Church, a religious corporation; Rev. Msgr. Joseph W. Pokusa, individually; Estate of Rev. Msgr. Augustine T. Mozier, individually; Estate of Bishop Celestine J. Damiano, individually; Estate of Bishop George H. Guilfoyle, individually; Bishop James L. Schad, individually; Bishop James T. McHugh, individually; and Diocese of Camden, a religious corporation, Defendants-Respondents, and
Rev. James P. McIntyre, individually; Estate of Rev. Msgr. Dennis J. Rigney, individually; Estate of Rev. Francis J. Flemming, individually; Rev. Msgr. Philip T. Rigney, individually; Rev. Msgr. Glendon E. Robertson, individually; St. Pius X, a religious corporation; Estate of Joseph P. Barber, individually; Our Lady of Mt. Carmel, a religious corporation; Rev. William C. O'Connell, individually; Rev. Norman T. Connelly, individually; Estate of Rev. Charles P. McColgan, individually; St. Peter Roman Catholic Church, a religious corporation; Rev. Joseph Shannon, individually; Rev. Msgr. Augustine J. Seidenberg, individually; St. Thomas Roman Catholic Church, a religious corporation; Brian Mai, individually; Sister Frances Regis, individually; Carolyn J. Noonan and Walter J. Noonan, Sr., individually; Rev. William Titmas, individually; Rev. John P. Bernard, individually; St. Gregory Roman Catholic Church, a religious corporation; St. Joseph Pro-Cathedral, a religious corporation; Rev. Joseph E. Orsini, individually; Rev. Joseph F. McGarvey, individually; St. Mary Magdalen, a religious corporation; Church of St. Maria Goretti, a religious corporation; Rev. Patrick Weaver, individually; St. Joan of Arc, a religious corporation; St. John, Collingswood, a religious corporation; St. Francis de Sales, a religious corporation; National Catholic Conference of Bishops; United States Catholic Conference, Incorporated; Archdiocese for the Military Services, United States of America; Military Vicariate, United States of America, a New York religious corporation; Military Vicariate United States of America; Bishop Louis Gelineau, individually; Bishop Kenneth A. Angell, individually; St. Mary's Church, Bristol, a religious corporation; and The Roman Catholic Bishop of Providence, a Corporation Sole, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued April 2, 2001.
Decided August 8, 2001.
*1165 Stephen C. Rubino, Westmont, argued the cause for appellant, Melissa Marshall (Ross & Rubino, attorneys; Mr. Rubino, on the brief).
Gerard W. Quinn, Atlantic City, argued the cause for respondents, Rev. Msgr. Joseph A. von Hartleben, Rev. Francis Gaffney, Maryanne Canale, Msgr. William J. Reynolds, and St. Raymond's Catholic Church (Cooper, Perskie, April, Niedelman, Wagenheim & Levenson, attorneys; Mr. Quinn, on the brief).
Joseph H. Kenney, Cherry Hill, argued the cause for respondents, Diocese of Camden and Catholic Social Services, Diocese of Camden (Kenney & Kearney, attorneys; William J. DeSantis, on the brief).
Joseph D. O'Neill, Vineland, for respondent Bishop James T. McHugh joins in the brief of respondents Rev. Msgr. Joseph A. von Hartleben, Rev. Francis Gaffney, Maryanne Canale, Msgr. William J. Reynolds, and St. Raymond's Catholic Church and the brief of respondents Diocese of Camden and Catholic Social Services, Diocese of Camden.
Lentz & Gengaro, West Orange, for respondents Estate of Bishop George H. Guilfoyle, Estate of Archbishop Celestine J. Damiano, and the Estate of Monsignor Augustine T. Mozier, join in the brief of respondents Rev. Msgr. Joseph A. von Hartleben, Rev. Francis Gaffney, Maryanne Canale, Msgr. William J. Reynolds, and St. Raymond's Catholic Church and the brief of respondents Diocese of Camden and Catholic Social Services, Diocese of Camden.
Hueston, McNulty & Mueller, Florham Park, for respondent Estate of the Reverend John P. Kelly, join in the brief of respondents Diocese of Camden and Catholic Social Services, Diocese of Camden.
Archer & Greiner, Flemington, for respondents Bishop James L. Schad, Monsignor Joseph W. Pokusa, Monsignor Timothy L. Ryan, and Our Lady Star of the Sea Church, join in the brief of respondents Diocese of Camden and Catholic Social Services, Diocese of Camden.
Before Judges HAVEY, CUFF and LISA. *1164
*1166 The opinion of the court was delivered by LISA, J.A.D.
In this appeal we consider only the case of plaintiff, Melissa Marshall[1] (plaintiff). She is one of many plaintiffs who have brought this class action[2] against numerous entities and clergy of the Roman Catholic Church (defendants). The putative class of plaintiffs are Roman Catholics who were allegedly sexually assaulted by Roman Catholic priests in the Diocese of Camden (Diocese) and the Diocese of Providence, Rhode Island. Plaintiff, however, was not abused by a priest. She alleges she was abused by her father, defendant, Walter Noonan (Noonan), but she also makes claims against defendants because they allegedly failed to address the abuse or assist her when she reported it to them.
Noonan's abuse of plaintiff occurred over a one-year period when she was approximately thirteen-years-old. She first reported it to one of the defendants at age fourteen in 1983. She last reported it to the defendants in 1987, at age seventeen. She filed this complaint on October 31, 1994, approximately seven-and-one-half years after reaching age eighteen. Plaintiff appeals from a summary judgment dismissing her complaint because it was barred by the statute of limitations, rejecting her claim that the religious duress of the defendants should have tolled the statute's running.[3] The applicable limitation period is two years from accrual of the cause of action,[4]N.J.S.A. 2A:14-2, or from age eighteen if accrual occurred during minority. N.J.S.A. 2A:14-21; Green v. Auerbach Chevrolet Corp., 127 N.J. 591, 606 A.2d 1093 (1992). Plaintiff also appeals from ten interlocutory orders culminating in the summary judgment order.
Plaintiff argues on appeal that the trial judge erred in granting summary judgment because genuine issues of material fact were in dispute, thereby necessitating a plenary hearing on the issue of tolling; in barring the testimony of her expert witnesses; in dismissing various other claims against defendants prior to his ruling on the summary judgment; and in refusing to recuse himself. We reject these arguments and affirm.
Plaintiff has sued her former parish, several priests in the parish, a nun, a high-school teacher and principal, Catholic Social Services (CSS)[5] and the Diocese of Camden. We are satisfied from our review of the record that summary judgment was appropriate because no reasonable factfinder could find that religious duress precluded plaintiff from filing this action *1167 against defendants until October 1994. Further, even if plaintiff's assertion is accepted that defendants failed to protect her or attempted to prevent her from taking action against Noonan, the principles of duress require proof that defendants attempted to prevent her from taking action against them. The record lacks such evidence.

I
Considering the evidentiary material in a light most favorable to plaintiff, see Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 666 A.2d 146 (1995), these are the facts. On May 15, 1969, plaintiff was born into a Roman Catholic family, which belonged to The Most Holy Redeemer parish in Westville Grove. Her mother was a substitute teacher at the parish school. Plaintiff was baptized as an infant and made her first penance, first holy communion, and confirmation at The Most Holy Redeemer parish. She was educated in Catholic schools, attended Mass regularly, and was married in the Roman Catholic Church. She "learned to respect priests as direct messengers of God." She "developed great admiration, trust, reverence and respect for and obedience to Roman Catholic priests, who occupied positions of tremendous influence and persuasion as dominant authority figures in [her] life."
When Noonan "regularly and repeatedly sexually molested and abused" her, for approximately one year, plaintiff knew what her father was doing to her was wrong, as evidenced by her deposition testimony:
Q. Did you know the first time that your father did something to you that had a sexual overtone that what he was doing was wrong?
A. Yes, I did.
....
Q. Could you tell us what the act was?
A. ... [H]e had reached up under my top and started fondling my breasts.
Q. And that was the first time?
A. Yes.
Q. Now, when he did that the first time, did you know that was wrong?
A. Yes.
....
Q. Every time it happened, did you know it was wrong?
A. Yes.
Q. And every time it happened, did it bother you?
A. Yes, it did.
Q. And when I say bothered you, could you tell us how it bothered you?
A. I was upset. I wasI was upset. I was afraid. I felt I was doing something wrong.
Q. Was it affecting you?
A. Yes it was.
Q. How?
A. I was just very depressed, upset, scared. I was afraid to go around him.
Plaintiff did not report Noonan's abuse during the time it was occurring because she was afraid of him. In Noonan's criminal trial in 1993, she testified that "[h]e just absolutely petrified me, I was scared to death of him." She continued, "He was very intimidating. He justthere was one occasion where I had said I was going to kill myself and I asked him if he would stop me and he said no, if that's what you want to do." Plaintiff has given conflicting testimony about express threats by Noonan. In her deposition testimony, she testified he never threatened her with consequences if she reported the abuse. However, she further testified she believed the fact that Noonan could resume his abuse of her constituted a threat to keep her quiet. She certified that Noonan *1168 "threatened my life to maintain my silence of his sexual abuse of me." She reported to an examining psychiatrist in 1998 that during the time of the abuse she told her father she wanted to run away from home to get away from him, to which he replied he would find her wherever she was and burn the house down.
In 1983, plaintiff's mother asked plaintiff and her sister, plaintiff Roxanne Noonan Angell (Roxanne), if Noonan had "done anything sexually" to them. Plaintiff said no, but Roxanne said yes. Plaintiff's mother took the girls to their parish pastor, defendant Monsignor Joseph A. von Hartleben (von Hartleben), to discuss the matter. Plaintiff did not tell von Hartleben that Noonan had sexually abused her. After conferring with von Hartleben, plaintiff's mother took her and Roxanne to CSS for counseling. There they met with case worker Sister Frances Regis (Regis).
In a certification and deposition, plaintiff claims she met privately with Regis at CSS and told her Noonan had sexually abused her. Plaintiff told Regis of the abuse because she hoped the Diocese could stop her father from sexually abusing Roxanne, which she knew had continued even after Noonan stopped abusing her. This was plaintiff's only visit with Regis. The CSS records do not support plaintiff's claim that she told Regis of Noonan's abuse. The records identify the presenting problem as "Father involved with Roxanne," and make no mention of plaintiff's report that Noonan abused her. On other occasions, plaintiff stated she did not tell Regis her father abused her because she was afraid of him.
Plaintiff believed there was a "lack of support and guidance" available to her, which left her feeling hopeless. Although she started to question her faith, plaintiff dispelled those questions for fear of going to hell. She was upset, confused, and angry. She became withdrawn and self-destructive. Although she experienced suicidal ideation, she never attempted to take her life because the Church considered suicide a sin, and she feared the consequences: eternal damnation.
Shortly after plaintiff graduated from elementary school in 1983, she was hired by The Most Holy Redeemer parish to work in the rectory on weekends. At the time, von Hartleben was pastor, and defendants Reverend James P. McIntyre (McIntyre) and Reverend Francis Gaffney (Gaffney) were priests at the church. Plaintiff attended Gloucester Catholic High School (GCHS) from 1983 until she graduated in June 1987. Defendant Reverend Joseph Martelli (Martelli) was the GCHS principal.
In 1986, plaintiff began to disclose the abuse to various people in her life. She told her friends, Jeanine Nestore and Maureen Saylor, that Noonan abused her. In the fall or winter of 1986, at Nestore's suggestion, plaintiff disclosed the abuse to defendant Brian Mai (Mai), a GCHS teacher.
Apparently, Mai told plaintiff he would have to call the Division of Youth and Family Services (DYFS). Plaintiff told him not to call because of her understanding that "DYFS meant children got removed from the home". Mai told plaintiff that if she did not tell Martelli, the school principal, about the abuse, he would have no choice but to call DYFS. Plaintiff met with Martelli and disclosed the abuse in either December 1986 or January 1987. Plaintiff believed Martelli, a priest, could guide her through the turmoil she was experiencing. Martelli said he could not help plaintiff because "it was too late." Yet, Martelli also said he had to think about what plaintiff told him and he would get back to her. They met again in January 1987 and Martelli said that after thinking about what plaintiff had told him and *1169 "looking into it," he concluded the abuse had happened too far in the past for anyone to do anything about it and "sometimes it's just best to leave things in the past." Plaintiff understood this to mean she was to stop talking about the abuse; she feared there would be some unspecified consequences if she did not.
In the fall of 1986, plaintiff disclosed to a friend, Kim Ruehle (Ruehle), that Noonan had abused her. Ruehle, who was dating plaintiff's brother, Walter Noonan (Walter), urged plaintiff to tell Walter about it. Plaintiff refused. Ruehle then suggested plaintiff talk to Ruehle's roommate, Tom Marshall, who was a total stranger to plaintiff. She met with Marshall and told him of the abuse.
Ruehle and Marshall informed Walter of the abuse. Thereafter, sometime between January and March 1987, plaintiff wrote Walter a letter confirming the abuse occurred. Plaintiff knew her father had abused her, his abuse had caused her emotional harm, and had caused her physical harm because she had been hurting herself. After Walter received the letter, he and plaintiff discussed her allegations against their father.
In March 1987, plaintiff's mother came home early and found Noonan in the bathroom with Roxanne. Plaintiff was home at the time. As a result, plaintiff became "mentally unstable." Soon thereafter, she told Marshall of the incident, and he said that was "enough" and he would get her out of the house that night. Marshall, Ruehle, plaintiff, and plaintiff's mother met with Gaffney at The Most Holy Redeemer rectory. Plaintiff told Gaffney of the abuse. Marshall, plaintiff's mother, Ruehle, and Gaffney helped her move. Plaintiff went to live with Ruehle and Marshall (who she eventually married).
One month later, in April 1987, von Hartleben told plaintiff that because of either "what was going on at home with the family and all" (as she testified at deposition) or her "continued reports of incest to Father Martelli, Father Gaffney, [CSS] as well as the monsignor himself" (as she claimed in a certification), she could not continue to work in the rectory. Plaintiff interpreted this termination as an implied directive "to maintain silence, [or she] would suffer further consequences," including excommunication from the Catholic Church. She thought God would punish her if she spoke out against the Church for not helping her. Plaintiff had no further contact with any representative of the Church about her claims of sexual abuse after von Hartleben terminated her from her employment with the parish.
After plaintiff moved out of her family's home, she disclosed Noonan's sexual abuse to additional people. In 1987, in an effort to obtain financial aid for college, she called Congressman Florio's office and explained to a staff member that she was not living at home and being supported by her parents, having moved out because of her father's sexual abuse. Plaintiff also wrote a letter to Governor Kean, in which she detailed her story of abuse "in hopes of obtaining some form of financial aid." In this letter she described her disclosures about the abuse of her and Roxanne to priests, a nun and school officials. She described that when her mother initially questioned her and Roxanne about the abuse, "[o]ut of absolute total fear of my father I denied that anything happened between he and I." Regarding the contact with the nun (Regis) at CSS, she stated "at this time I wa[s] confronted about my father which out of fear I again denied that anything happened between he and I." She also rendered a detailed account of the bathroom incident with Roxanne.
During the summer of 1987, plaintiff went to the Gloucester County Mental Health Clinic and disclosed Noonan's *1170 abuse. Plaintiff intentionally refrained from contacting the clinic before age eighteen because she did not want the clinic to contact DYFS, as she feared DYFS would remove her from the home.
In either 1989 or 1990, plaintiff and Roxanne, who had been estranged from each other since plaintiff left home in 1987, reestablished contact and discussed the abuse that Noonan inflicted upon them. In approximately November 1990, plaintiff wrote a letter to their brother, Darrell, signed by both plaintiff and Roxanne, warning him about leaving his two young daughters alone with Noonan and their mother. She stated: "I hope you understand the severity of the situation. Don't think of yourself. Your children are most importantwhat happens in your youngest years effects the rest of your life." (emphasis added). Plaintiff further warned Darrell that if he continued to allow his children to stay with Noonan and their mother, she and Roxanne would "take legal action," that she had "checked the procedures" and knew the process for doing so.
In February 1991, plaintiff and Roxanne wrote a letter to all of their relatives, which included grandparents and aunts and uncles on both sides of the familya total of thirteen people (excluding spouses), informing them Noonan had abused plaintiff and Roxanne, providing some detail, explaining its effect on them, telling the relatives of their fear for their young nieces (Darrell's children), and imploring them to convince Noonan and plaintiff's mother to seek psychological help.
Sometime before March 18, 1991, plaintiff and Marshall consulted with attorney Joseph McCullough (McCullough) about Noonan's sexual abuse of plaintiff. On March 18, 1991, after meeting with McCullough, plaintiff went to the prosecutor's office and reported the abuse. She was told they could take no action until charges were filed with the local police department. That evening, plaintiff and Roxanne went to the Deptford Police Department for the purpose of bringing charges against their father, and plaintiff gave a full statement of the abuse.
Plaintiff testified before the grand jury. Noonan was tried in September 1993 for the crimes that he had committed against Roxanne. (The criminal statute of limitations had expired regarding the abuse of plaintiff.) Plaintiff testified against Noonan at trial. Noonan was convicted and in January 1994 was sentenced to ten years imprisonment.
It was not until her father had been convicted and sentenced to prison that plaintiff felt free of his threats. Plaintiff again met with McCullough, who referred plaintiff to her present attorney. The complaint was filed on October 31, 1994.[6] Plaintiff claims she did not file her lawsuit earlier because she was afraid of her father, the Church, and embarrassment.
Plaintiff believed Martelli, Gaffney, and von Hartleben had conspired with her parents to hide the truth about what happened to her. Plaintiff admits none of the priests or Regis or anyone from the Diocese ever told her not to discuss Noonan's abuse of her with anyone. However, she believed their actions conveyed that message.
Based upon these events, plaintiff alleges defendants refrained from reporting the abuse due to "fear of scandal to the Church" because plaintiff's mother taught in Catholic school and because the Diocese protected child abusers who were respected *1171 members of the Church family "for the purpose of furthering the goals of the criminal conspiracy in lieu of the safety of the children."
The complaint and amended complaint assert a claim for sexual battery and violation of N.J.S.A. 2A:61B-1 against Noonan. Plaintiff alleges she had not "discovered, understood or appreciated" that the emotional, physical, and sexual "problems" she had been experiencing were the result of Noonan's abuse until January 1994. Accordingly, the "delayed discovery of the harm" delayed the accrual of her claims against defendants. Alternatively, plaintiff alleges that "prior to 1994, she suffered from various forms of psychological/psychiatric immobility, religious duress and duress which prevented, obscured, or made otherwise unknown, the fact that any cause of action was available to her against the various defendants."
Plaintiff asserts claims for negligent hiring, supervision and retention, and criminal conspiracy against defendants Bishop George H. Guilfoyle (Guilfoyle), Bishop James L. Schad (Schad), Bishop James T. McHugh (McHugh), CSS and the Diocese for their negligent hiring and retention of defendants von Hartleben, Gaffney, Martelli, Mai, and Regis. According to plaintiff, von Hartleben, Gaffney, Martelli, Mai and Regis failed to report her claims of sexual abuse because they were part of a conspiracy to protect pedophiles and sexual predators for the purpose of preventing church scandal.
Plaintiff also asserts claims for negligent entrustment, breach of fiduciary duty and respondeat superior against the same defendants for failure to protect plaintiff from Noonan by failing to report his abuse of her. Two counts charged "defendants" with violations of New Jersey's RICO statute, N.J.S.A. 2C:41-1 to -6.2.
The trial judge issued the following interlocutory orders, which plaintiff also appeals: (1) June 27, 1995, order dismissing the two RICO counts of the amended complaint; (2) January 17, 1996, order dismissing all claims premised on theories of vicarious liability, including respondeat superior; (3) May 29, 1996, case management order number one limiting plaintiffs' right to depose defendants until after plaintiffs were deposed on the statute of limitations issue; (4) April 8, 1997, order granting defendants' motion to dismiss the remainder of count three of the amended complaint, which sought damages based upon "generally accepted principles of canonical agency;" (5) April 3, 1998, order denying plaintiff's motion to compel the deposition of Rigney; (6) August 7, 1998, order barring Father Thomas P. Doyle (Doyle) from testifying as an expert on plaintiff's behalf; (7) December 14, 1998, case management order number five barring Dr. James B. Hoyme (Hoyme) from testifying as an expert on plaintiff's behalf; (8) January 19, 1999, order denying reconsideration of the December 14 order; (9) March 29, 1999, order denying plaintiff's motion for recusal, and other relief; and (10) January 14, 2000, order denying reconsideration of prior court orders.

II
Plaintiff contends the trial judge committed reversible error when he granted defendants summary judgment because: (1) the proffered testimony of her experts was wrongfully barred; (2) a plenary hearing was necessary to determine her credibility, mental state, the issue of defendants' duress, and any other equitable ground for tolling; and (3) her right to conduct discovery was improperly limited.
On appeal, we apply the same standard as the trial court in determining whether the grant or denial of a summary judgment motion was correct. Kopin v. Orange Prods., Inc., 297 N.J.Super. 353, *1172 366, 688 A.2d 130 (App.Div.), certif. denied, 149 N.J. 409, 694 A.2d 194 (1997); Antheunisse v. Tiffany & Co., Inc., 229 N.J.Super. 399, 402, 551 A.2d 1006 (App. Div.1988), certif. denied, 115 N.J. 59, 556 A.2d 1206 (1989). Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c); Brill, supra, 142 N.J. at 528-29, 666 A.2d 146. The ultimate determination is whether the record before us contains facts, viewed most favorably to plaintiff, "sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of [plaintiff]." Id. at 540, 666 A.2d 146. In the context here presented, the issue therefore is whether the record contains sufficient facts to support a finding of duress by defendants sufficient to toll the statute of limitations. We are satisfied such facts are not present and dismissal of plaintiff's complaint by summary judgment was appropriate as a matter of law.
We reiterate that plaintiff reported the abuse of her to defendants, at most, on three occasions: (1) 1983 to Regis; (2) 1986-87 to Mai (a teacher) and Martelli (the principal); and (3) March-April 1987 to Gaffney and von Hartleben. Two of these individuals offered assistance. Mai recommended reporting to DYFS. Gaffney assisted plaintiff in moving out of her home. Regis did nothing negative towards plaintiff; she counseled her on her one CSS visit (the records of which reflect no report of abuse of plaintiff). On the other hand, Martelli told her it was too late to do anything, and von Hartleben fired her from her job at the rectory. Plaintiff provided these facts of her own knowledge, without the need for discovery, in the light most favorable to her through her own testimony and certifications.
In addition to these factual predicates, plaintiff tendered the expert testimony of Doyle, a priest, and Hoyme, a psychiatrist, in support of her duress claim. In his reports, Doyle described at length the phenomenon of "religious duress," which he defined as "a state of mind whereby a person feels internally compelled to do or not do something because of a fear induced by a religious power and/or authority [i.e. the Church hierarchy]." He described how an individual such as plaintiff, raised in a strict Catholic household with close ties to the institutional Church, would consider it wrong to criticize or take action against members of the clergy or the Church for fear of excommunication or eternal damnation. Catholics are taught, according to Doyle, this is necessary "for the good of the Church." He opined that "[i]n sexual abuse cases, `the good of the [C]hurch' means that the victim should remain silent, refrain from making any public accusations, remarks or complaints and above all, avoid any contact with civil authorities in search of justice." Without providing any factual basis for support, he concluded that until Noonan was convicted and imprisoned, plaintiff was prevented by religious duress from initiating this civil action against defendants.
We agree with the trial judge that this constitutes an impermissible net opinion. Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981). Indeed, the facts in the record directly contradict Doyle's conclusion. Plaintiff did not remain silent, but spoke out to numerous individuals, including family members, friends, public officials and law enforcement authorities. She sought out and successfully obtained the assistance of civil authorities in prosecuting her father, and she played an active role in that prosecution. This she did more than three years before instituting this civil law suit.
*1173 Hoyme evaluated plaintiff in 1998. He concluded plaintiff suffers from post-traumatic stress disorder because of Noonan's abuse. He found that "the most powerful component by far in determining her behavior was her profound and pervasive fear of her father." He opined, however, that defendants "contributed directly and substantially" to plaintiff's injury by not assisting her and thereby enabling the continued abuse and coercion by Noonan. He concluded that until plaintiff was convinced by her father's conviction and imprisonment "that the judicial system worked and could be trusted" she did not have the ability to institute this civil law suit.
Hoyme's opinions also lack a factual foundation to connect the asserted cause and effect. He provided no basis for concluding that the elimination of plaintiff's fear of her father (by his incarceration) also eliminated her fear of excommunication or eternal damnation. This was a net opinion, ibid., which was properly barred.
We therefore conclude that these proffered expert opinions did not provide an additional basis to support plaintiff's contention that defendants' duress prevented her from bringing this action before 1994. All that remains, therefore, are plaintiff's factual predicates to support her contention.
Plaintiff argues the trial judge erred in determining that duress requires a threatening act. Relying upon Jones v. Jones, 242 N.J.Super. 195, 207-09, 576 A.2d 316 (App.Div.), certif. denied, 122 N.J. 418, 585 A.2d 412 (1990), the judge found that duress of any kind requires "some overt act of coercion." He held that, in the absence of a threat, there could be no coercion; plaintiff's failure to act was the result of a given religious belief, which was no basis for excusing her nonaction.
We agree with plaintiff that this is a misstatement of the legal meaning of duress. Nevertheless, we are satisfied plaintiff's claim of duress fails as a matter of law because none of defendants' remarks, actions, or inactions were made in an attempt to prevent plaintiff from asserting a claim against them or the Catholic Church.
Duress does not require a threat. In Rubenstein v. Rubenstein, 20 N.J. 359, 365, 120 A.2d 11 (1956), the Court defined duress as "that degree of constraint or danger, either actually inflicted or threatened and impending, sufficient in severity or in apprehension to overcome the mind or will of a person of ordinary firmness, ... such as in fact works control of the will." However, "[i]n the modern view," the Court continued, "moral compulsion or psychological pressure may constitute duress if, thereby, the subject of the pressure is overborne and he is deprived of the exercise of his free will." Id. at 366, 120 A.2d 11. Duress may take the form of moral compulsion or psychological pressure. Yet, even moral compulsion or psychological pressure are not wrongful unless they are "`so oppressive under given circumstances as to constrain one to do what his free will would refuse.'" Shanley & Fisher, P.C. v. Sisselman, 215 N.J.Super. 200, 213, 521 A.2d 872 (App. Div.1987) (citing Rubenstein, supra, 20 N.J. at 367, 120 A.2d 11).
In discussing the claim of duress, the Jones court was "of the view that, within certain limits, a prospective defendant's coercive acts and threats may rise to such a level of duress as to deprive the plaintiff of his freedom of will and thereby toll the statute of limitations." Jones, supra, 242 N.J.Super. at 208, 576 A.2d 316. The court explained what a plaintiff must establish in order to overcome the statute of limitations defense on a claim of duress:

*1174 [B]oth a subjective and objective standard must be satisfied in order for the plaintiff to prevail. Specifically, the duress and coercion exerted by the prospective defendant must have been such as to have actually deprived the plaintiff of his freedom of will to institute suit in a timely fashion, and it must have risen to such a level that a person of reasonable firmness in the plaintiff's situation would have been unable to resist.
[Id. at 208-09, 576 A.2d 316.]
Jones does not define duress as requiring a coercive act or threat. Rather, it speaks in terms of coercive acts and threats rising to a certain level of duress such that it "deprive[s] the plaintiff of his freedom of will." Id. at 208, 576 A.2d 316. Accordingly, duress, as Rubenstein and Sisselman instruct, also includes psychological pressure so long as the pressure is oppressive enough to overpower one's free will.
In Byrd v. Manning, 253 N.J.Super. 307, 310-11, 601 A.2d 770 (App.Div.), certif. denied, 130 N.J. 18, 611 A.2d 656 (1992), the plaintiff attempted to overcome the statute of limitations defense to his § 1983 federal civil rights action by claiming he was under duress by the defendants. The duress took the form of the defendants' prosecution of a criminal case against him and the concomitant prospect of the threat of imprisonment. Id. at 319, 601 A.2d 770. We rejected the plaintiff's argument, holding the prosecution of the plaintiff did not constitute duress because he failed to show the pursuit of the criminal complaint "was for the purpose of deterring or inhibiting his civil action against the defendants." Ibid. Moreover, the plaintiff failed to show he was deprived of his freedom of will. Ibid. In support of this conclusion, we noted the plaintiff had "sufficient clarity of mind to retain counsel, file criminal complaints against the police officers, testify during the 1989 municipal court proceedings and file pre-complaint motions in both the federal and state courts prior to the expiration of the statute." Id. at 319-20, 601 A.2d 770.
Focusing on the objective prong of the Jones test in our analysis of plaintiff's claim, Byrd supports a determination that, as a matter of law, plaintiff was not under duress sufficient to toll the statute of limitations. Like the defendants in Byrd, Id. at 319, 601 A.2d 770, nothing that Regis or any of the priests said or did was for the purpose of deterring or inhibiting plaintiff from instituting a civil action against them. Plaintiff's complaints were about a third party, namely Noonan. Thus, at most, defendants' actions only could be considered attempts at preventing her from asserting a claim or taking action against Noonan, not them.
Also, as in Byrd, ibid., plaintiff had "sufficient clarity of mind" to seek counsel in March 1991 for the express purpose of seeking legal advice about the abuse and to file a criminal complaint against Noonan. Prior to that time, she disclosed the abuse to numerous individuals. She understood and disclosed the adverse emotional impact on her. She was not isolated and alone; she had close allies in Roxanne and Marshall. Clearly, then, plaintiff had to have overcome her fear of her father because that was what she claimed had prevented her from reporting the abuse. However, nothing explains what enabled plaintiff to overcome the religious duress she claimed to be under.
Although Martelli told plaintiff it was too late to do anything, and von Hartleben fired her from her rectory job after she moved in with Marshall, presumably because of what was going on in her family, those were her last contacts with the church about the abuse. That was in early 1987. She knew then what the Church officials had done or failed to do, and she *1175 took no action. Although religious duress may be applicable to those plaintiffs who failed to institute legal action against defendants for their own abuse against them, an issue we need not address in this case, it cannot apply here where there was no abuse by defendants and no effort by defendants to prevent plaintiff from seeking redress for the sexual abuse committed against her by her father.
The failure of defendants to act is the essence of plaintiff's cause of action against them. The last failure to act was the firing in April 1987. That was when plaintiff's claim against defendants accrued. The question is what did defendants do to prevent plaintiff from asserting that claim against them upon reaching age eighteen, on May 15, 1987. The answer is nothing.
A Lopez[7] hearing on the issue of duress is not required because neither plaintiff nor her experts made any link between plaintiff's failure to assert a claim against defendants due to religious duress and the assertion of her claims after the incarceration of her father. While Noonan's incarceration may have freed plaintiff from her fear of him, there is no explanation from her or her experts as to how his incarceration freed her from her fear of excommunication or eternal damnation. Her fears and reasons for not suing are set out in her certifications and in her deposition testimony. Accepting that information as true, as we must in summary judgment analysis, no basis is provided to establish tolling by religious duress. Accordingly, a hearing to determine her credibility was not necessary. Lopez, supra, 62 N.J. at 275, 300 A.2d 563.
N.J.S.A. 2A:61B-1c expressly permits the court to find that the two-year statute of limitations was tolled by a defendant's duress and requires a plenary hearing. However, N.J.S.A. 2A:61B-1a(1) imposes liability upon "[a] parent, foster parent, guardian or other person standing in loco parentis within the household who knowingly permits or acquiesces in sexual abuse by any other person." (emphasis added). Indeed, the Senate Judiciary Committee Statement that accompanied L.1992, c. 109 [N.J.S.A. 2A:61B], makes clear that the statute applies to persons "in a position of parental authority." None of the defendants were within plaintiff's household and, therefore, cannot be liable under this statute.[8] We therefore reject plaintiff's argument that this statute applies to defendants.
The trial judge's "refusal" to allow plaintiff to conduct discovery is irrelevant. Plaintiff identified all the acts on defendants' part that constituted duress. Plaintiff also identified why she felt coerced by these acts. There was nothing else to discover. In any event, although the May 29, 1996 case management order number one limited discovery to the tolling issue and prohibited plaintiff from deposing anyone until after she had been deposed, plaintiff was deposed in early 1997 and then never deposed anyone. Moreover, plaintiff's claim that she was precluded from deposing Msgr. Philip T. Rigney, a "critical" witness, is disingenous; she fails to explain why his testimony is critical. Rigney was not a defendant to plaintiff's claims. He was not assigned to her parish, and plaintiff never mentioned his name as one of those priests to whom she had discussed her abuse by Noonan.
*1176 Therefore, anything Rigney would have to say would have had no impact on her claim of duress.
The disposition of discovery issues is within the trial court's discretion. Connolly v. Burger King Corp., 306 N.J.Super. 344, 349, 703 A.2d 941 (App.Div.1997). We find no abuse of discretion in the discovery orders here.

III
Plaintiff seeks reversal of three orders that together dismissed a number of her claims: the June 27, 1995, order, which dismissed the RICO counts; paragraph two of the January 17, 1996, order, which dismissed all claims premised on theories of vicarious liability; and the April 8, 1997, order, which dismissed claims based upon the theory of canonical agency. Since plaintiff's claims were barred by the statute of limitations, we need not consider the contention they were improperly dismissed, except to say, with respect to the RICO claims, we substantially agree with the reasons for dismissal on substantive grounds expressed by the trial judge in his written opinion dated June 27, 1995.
Finally, plaintiff contends the trial judge improperly declined to recuse himself. According to plaintiff, J.L. v. J.F., 317 N.J.Super. 418, 722 A.2d 558 (App.Div.), certif. denied, 158 N.J. 685, 731 A.2d 45 (1999), required recusal. Moreover, plaintiff claims the judge should have been recused because there was an appearance that he had prejudged various legal issues. We find these contentions are clearly without merit, and discussion in a written opinion would have no precedential value. R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] Melissa Marshall's husband, Thomas Marshall, is also a plaintiff, asserting a per quod claim.
[2] The record does not reveal whether the action was certified as a class action. R. 4:32.
[3] The claim of plaintiff, John Smith, who was similarly situated to plaintiff, was dismissed on the same grounds. Smith has not appealed. Plaintiff's and Smith's claims were severed, rendering the summary judgment order final as to them. The claims of the remaining plaintiffs remain pending in the Law Division.
[4] Claims made under New Jersey's RICO statute, N.J.S.A. 2C:41-1 to -6.2, were dismissed on substantive grounds. Therefore, we need not determine the limitation period for such claims. We recognize that one New Jersey court has concluded the limitation period for civil RICO claims is four years, In re Integrity Insurance Co., 245 N.J.Super. 133, 136, 584 A.2d 286 (Law Div.1990), and a five-year period is specified in the Criminal Code. N.J.S.A. 2C:1-6(g). See also Fraser v. Bovino, 317 N.J.Super. 23, 39, 721 A.2d 20 (App.Div.1998), certif. denied, 160 N.J. 476, 734 A.2d 791 (1999).
[5] Denominated in the complaint by its former name, Catholic Charities.
[6] Through counsel, the Diocese agreed to toll the statute of limitations, effective January 1, 1994, to allow for a review of plaintiff's allegations and consider a resolution. The Diocese withdrew from the tolling agreement effective October 18, 1994.
[7] Lopez v. Swyer, 62 N.J. 267, 300 A.2d 563 (1973).
[8] While both plaintiff's parents could be held liable under this statute, plaintiff did not avail herself of the opportunity provided by the trial court to establish such liability. Accordingly, his dismissal order included them along with all other defendants.