COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| JOHN DOE, | § | No. 08-09-00283-CV |
| Appellant, | § | Appeal from |
| v. | § | County Court at Law No. 3 |
| THE CATHOLIC DIOCESE OF EL PASO and MSGR. THOMAS ROWLAND, | § | of El Paso County, Texas |
|  | § | (TC # 2006-2747) |
| Appellees. | § |  |

**O P I N I O N**

John Doe, a former altar boy, filed suit against Msgr. Thomas Rowland, the supervisory priest, and The Catholic Diocese of El Paso. The trial court granted summary judgment in favor of the Appellees. Because Doe's causes of actions are barred by limitations, we affirm the judgment of the trial court.

**FACTUAL BACKGROUND**

John Doe was born on January 4, 1948. When he was approximately sixteen years of age,[1] he was sexually abused by Father Hay. Three incidents occurred during the summer of 1963 or 1964 while Doe served as an altar boy at Our Lady of the Light, a parish within the Diocese. At that time, Msgr. Rowland was the head priest at the church.[2] Father Hay was not regularly assigned to the church, but he occasionally filled in and gave mass on Sundays.

---

[1] Discrepancies exist as to whether Doe was thirteen or sixteen years old and the time in question.

[2] In the record, the spelling of the monsignor's name appears as both "Rowland" and "Roland."

## *The Incidents*

One Sunday after Father Hay served the five o'clock mass, he invited Doe and two other altar boys to get hamburgers at a local restaurant. After picking up the food, Father Hay took the boys to his apartment where they could watch television. He then filled the bathtub with water and asked the boys to take off their clothes and "come swimming." The boys complied. Father Hay joined the boys in the tub and began splashing and playing with them. At some point during the horseplay, Father Hay forced Doe to stand up, shoved him against the wall, and anally penetrated him while the other boys watched. After Father Hay finished, Doe climbed out and put on his clothes. He sat in the other room, trying to focus on the television, but through the open door, he saw Father Hay perform oral sex on the other two boys. Eventually Father Hay gave the three a ride back to the church parking lot.

A few weeks later, the boys again served five o'clock Sunday mass with Father Hay. Once more, Father Hay took them to get hamburgers and then back to the apartment. This time, Father Hay performed oral sex on Doe and penetrated the other two boys. The third and final incident also occurred on a Sunday after five o'clock mass. This time, Doe remained clothed and watched television in the living room, but witnessed the two other boys naked in the bathtub with Father Hay. Thereafter, Doe stopped serving mass with Father Hay.

Doe initially kept quiet about the first incident of sexual abuse. He knew it was wrong when it happened, but he was confused and felt as though it might have been his fault.

Q. But you knew it was wrong and you didn't tell anybody?

A. No, sir. I take that back, sir. When that happened, there was a space, and I did tell -- me and the other alter [sic] boy. I told him, You know what, we should tell Father Roland what happened. And he said, No. And I said, Yes. We had to -- we had mass on Wednesday, and Father Roland was there. So when we were in the rectory, I asked him, Father Roland, after mass, can we talk to you? He says, Yeah,

okay.

When the mass was over, we talked to him. And he said, What's going on? And we asked him, Father Roland, something happened to us with Father Hay. He did sex with us. He got, like, aggravated and told me, You kids, you're going to be quiet or you're going to get yourselves in hot water. After that I said, Forget it.

After the first incident, Doe was afraid, but he went with Father Hay a second time because he was hungry and confused. He also said he was afraid of Father Hay because "[h]e told me he was God."

### Doe's Personal Background

Doe was raised in the Catholic Church. His father was a very strict disciplinarian who routinely beat Doe with a belt. Doe was about eleven years old when he began serving as an altar boy. He continued to serve until he was drafted into the Army.

During his military service, Doe received the Soldier of the Year Award. In 1971, he was honorably discharged and went into the reserves with the Army National Guard. In June 1974, Doe was again honorably discharged. He returned to the church looking for Father Hay[3] in order to confront him and "get even."[4]

Doe ultimately left the Catholic Church and became a member of the Pentecostal Church. He married and has raised his children in the Pentecostal faith. His mother passed away in 1994 or 1995 and his father died around 1996. Doe never told either one of them about the abuse because he feared his father would beat him. And he never reported it to the police because he was afraid it would end up in the newspaper and he was embarrassed.

---

[3] There are several references in the deposition to the fact that Father Hay is no longer alive, but it is unclear when he died.

[4] Doe told one of the expert witnesses, Dr. William Foote, that he "wanted to go and see if I could hit [Father Hay] with a baseball bat. I could not. I was kind of small. I thought I was queer. When people would make fun of one (a gay person) - if they knew what had happened, they would make fun of me. This is why all this time no one knows about it."

Sometime after his mother's death, Doe sought medical help for depression from a civilian psychiatrist, Dr. Patel, who helped him obtain Social Security disability benefits, Veteran's Administration Benefits, and access to VA medical care. The visit to Dr. Patel was the first time Doe sought treatment for any psychiatric or psychological problems. According to Doe's employment records, he received his last paycheck in May 1996, at which point he "just quit. I could not handle it anymore. I was getting depression and stuff like this." He has not returned to work.

## PROCEDURAL BACKGROUND

Doe filed his original petition in June 2006, alleging that Father Hay had committed torts of assault and battery, intentional infliction of emotional distress, breach of fiduciary duty, and negligence. He alleged negligence and vicarious liability against the Diocese and negligence, breach of fiduciary duty, and intentional infliction of emotional distress against Msgr. Rowland. The Diocese and Msgr. Rowland filed general denials and asserted various affirmative defenses, including limitations. Thereafter, both parties filed hybrid motions for summary judgment.

Doe filed responses to the motions for summary judgment and amended his petition. With regard to Msgr. Rowland, he alleged negligence, breach of fiduciary duty, and intentional infliction of emotional distress. With respect to his negligence claims, Doe alleges five specific acts.

• failing to report the sexual abuse to Bishop despite the Diocese's policy to do so;

• failing to report the sexual abuse to the authorities;

• fraudulently concealing the tortious conduct of Father Hay by misrepresenting that if Doe went forward with his allegations, he would suffer negative consequences;

• engaging in a cover-up to avoid church accountability and negative publicity; and

• failing to inform Doe's parents that Father Hay was a "sexual threat to their child."

Additionally, the amended petition alleged claims for vicarious liability and negligence against the Diocese. Doe claimed the Diocese is vicariously liable for the conduct of Msgr. Rowland because the latter was acting within the course and scope of his employment and because the Diocese, as employer and principal, aided in the commission of the torts. As to negligence, Doe alleged:

• negligent recruiting, hiring, and supervision of priests;

• failing to inform parents that certain priests were sexual threats;

• ignoring warnings from medical professionals even within the Catholic Church that certain priests were potentially sexually dangerous to children;

• misrepresenting facts to victims who requested information about such priests in order to fraudulently conceal the Diocese's own negligence;

• failing to alert parishioners, previous parishes and the surrounding communities where abusive seminarians, deacons, and priests had served that they were exposed to known or suspected child molesters;

• ignoring warnings from other members of the clergy who believed that such priests were threats to children;

• failing to report the crimes committed by priests to law enforcement officials and obstructing or interfering with law enforcement investigations concerning abusive priests;

• making decisions revealing the interests of the abusive priests and the Church's desire to avoid scandal, were vastly superior to the interests of the victims;

• using the church's influence to alter the outcome of the criminal legal process relating to

priests who had been engaging in illegal sexual acts and conspiring to "spirit" such priests out of the state or country so that the church could avoid liability and accountability to civil authorities and their victims and the church could "recycle [the priests] back into active ministry elsewhere;"

• fostering an environment and culture where abuse of children could flourish and in which it was clearly understood that there was no corporate accountability for criminal acts toward children;" and

• failing to enact policies and procedures to prevent such sexual abuse by priests.

Doe claimed the applicable statute of limitations was tolled because of "psychological coercion . . . constituting duress," equitable estoppel, and quasi estoppel. Finally, he contended that Texas Practice and Remedies Code Section 16.001 tolled limitations because he was emotionally and mentally incapacitated and of unsound mind at the time the causes of action accrued. On appeal, the only issues before us are whether duress, unsound mind, or equitable estoppel operate to defeat limitations.

## THE EVIDENCE

Doe tendered his own deposition; a paper written by Father Thomas Doyle and Dr. Marianne Benkert on the effect of religious duress on victims of clergy sexual abuse; an affidavit, curriculum vitae, and report of Father Doyle; an affidavit by Dr. Benkert; and a report by Dr. William Foote, Ph.D. Appellees objected to portions of Doyle's affidavit, curriculum vitae, and report; the article written by Doyle and Dr. Benkert; Dr. Benkert's affidavit; and Dr. Foote's report.[5]

---

[5] The Diocese complained that because Father Doyle is neither a psychologist nor a psychiatrist, he is not qualified to opine as to the psychological consequences of religious duress. The Diocese also objected to his report as hearsay. Msgr. Rowland objected to the report because it was based on canon law as opposed to state law. As for Dr. Benkert's affidavit, the Diocese objected that her opinions failed the *Daubert* standard and asked that her affidavit be stricken "as to the psychological implications of religious distress." Both defendants objected to Dr. Foote's report as hearsay.

## THE HEARINGS

### *Proceedings Before Judge Alvarez*

This case was originally heard by Judge Javier Alvarez. On January 26, 2009, he granted via letter the Diocese's motion for summary judgment on limitations only. Three days later, the defendants each filed their objections and motions to strike Doe's summary judgment evidence. On February 2, Judge Alvarez sustained those objections and, via e-mail, granted Msgr. Rowland's motion for summary judgment on limitations. All of the foregoing was done without a hearing.

On February 26, Doe filed a motion for reconsideration. The next day, Judge Alvarez held a hearing on the defendants' motion for entry of final judgment. Upon Doe's request, Judge Alvarez allowed him to file a response to the expert witness objections. On March 3, Judge Alvarez issued an order finding that live testimony of experts was unnecessary but allowing Doe two weeks to submit affidavits of its experts demonstrating admissibility standards under Rule 702. Meanwhile, a separate order was issued on March 11 sustaining both defendants' objections to Dr. Foote's report.[6] Doe filed his response on March 13 addressing the qualifications of Father Doyle and Dr. Benkert to render expert opinions but the response did not address Dr. Foote's report. On March 24, Judge Alvarez signed an order granting summary judgment and an order sustaining the defendants' objections to Dr. Benkert and Father Doyle. Neither of these orders references Dr. Foote.

Doe then filed a motion to recuse Judge Alvarez and a motion for a new trial. Judge Alvarez voluntarily recused himself and Regional Administrative Judge Steve Ables appointed himself to preside over the case.

---

[6] Although the order was not filed until March 11, on February 4, Judge Alvarez sent a letter sustaining Msgr. Rowland's objections to Dr. Foote's report and asking counsel to prepare an order consistent with his ruling.

*Proceedings Before Judge Ables*

On May 15, Judge Ables denied Doe's motion for a new trial but granted his motion for reconsideration.[7] He held a hearing on June 17 to address the defendants' objections to Father Doyle and Dr. Benkert. In Judge Ables' own words, the purpose of hearing was to determine, "whether or not their methodology is appropriate, whether or not they're reliable and we should consider their testimony." Both Doyle and Benkert testified at the hearing and Judge Ables ruled the testimony was admissible. Following a second hearing limited to arguments of counsel, Judge Ables granted both motions for summary judgment. This appeal follows. Doe complains that summary judgment was improper because he raised genuine issues of material fact as to whether his claims are time barred and as to the alleged negligence of the Diocese and Msgr. Rowland. Because we find Issue One dispositive of the case, we need not address Issue Two.

## STANDARD OF REVIEW

The standard of review for a traditional summary judgment asks whether the movant carried the burden of showing that there is no genuine issue of material fact such that judgment should be granted as a matter of law. *See American Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997). Summary judgment is proper if the defendant disproves at least one element of each of the plaintiff's causes of action or establishes all elements of an affirmative defense to each claim. *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002); *Shah v. Moss*, 67 S.W.3d 836, 842 (Tex. 2001). Once the movant establishes a right to judgment as a matter of law, the burden shifts to the non-movant to produce evidence raising a genuine issue of material fact. *City of Houston v. Clear*

---

[7] Doe's motion for reconsideration included a specific request that the court reconsider Judge Alvarez' ruling on Dr. Foote's report. The parties disagree as to whether Judge Ables intended his order vacating "prior rulings by the court" to include Judge Alvarez' ruling as to Dr. Foote. In reading the plain language of the order it appears to vacate all prior rulings which would include the order sustaining the defendants' objections.

*Creek Basin Authority*, 589 S.W.2d 671, 678-79 (Tex. 1979).

In deciding whether there is a disputed material fact issue precluding summary judgment, we take as true all competent evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002), *citing Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). Evidence favoring the movant's position will not be considered unless it is uncontradicted. *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex. 1965).

In the case of an affirmative defense such as limitations, the movant must establish all the elements of an affirmative defense as a matter of law. *City of Houston*, 589 S.W.2d at 678; *Velsicol Chemical Corp. v. Winograd*, 956 S.W.2d 529, 530 (Tex. 1997). If the plaintiff's pleadings do not affirmatively show that the limitations period has run, the movant has the burden of proving that the suit is barred by limitations as a matter of law. *Gibson v. John D. Campbell and Co.*, 624 S.W.2d 728, 731 (Tex.App.--Fort Worth 1981, no writ).

The Texas Rules of Civil Procedure also permit a party to move for a no-evidence summary judgment "without presenting summary judgment evidence," but they require the moving party to "state the elements as to which there is no evidence." TEX.R.CIV.P. 166a(i); *Aguilar v. Morales*, 162 S.W.3d 825, 834 (Tex.App.--El Paso 2005, pet. denied). The burden then shifts to the non-movant to produce summary judgment evidence raising a genuine issue of material fact regarding each element challenged in the motion. *Aguilar*, 162 S.W.3d at 834.

A no-evidence motion for summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard of review. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003), *cert. denied*, 541 U.S. 1030, 124 S.Ct. 2097, 158 L.Ed.2d 711 (2004). We

view the evidence in the light most favorable to the non-movant, and we must disregard all contrary evidence and inferences. *Id*. at 751. A genuine issue of material fact is raised if the non-movant produces more than a scintilla of evidence regarding the challenged element. *Id*. There is not a scintilla of evidence when the evidence is so weak as to do no more than create a mere surmise or suspicion of material fact. *Ianni v. Loram Maintenance of Way, Inc.*, 16 S.W.3d 508, 513 (Tex.App.--El Paso 2000, pet. denied). Evidence that fails to constitute more than a mere scintilla is, in legal effect, no evidence at all. *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001).

## STATUTES OF LIMITATIONS

In Issue One, Doe contends a genuine issue of material fact exists as to whether his claims are barred by limitations. First, we address his argument that duress applies to toll the statute of limitations. Next, we consider his contention that the doctrine of unsound mind tolls limitations. Finally, we will address his claim that a fact issue exists as to whether the doctrine of equitable estoppel applies, precluding Appellees from asserting limitations as a defense.

A cause of action generally accrues at the time when facts come into existence authorizing a claimant to seek a judicial remedy. *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex. 1990). In Texas, a plaintiff's cause of action accrues, and the applicable limitations period starts to run, "when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996). This is true even in sexual abuse cases. *See id.* at 22. However, when a plaintiff is under eighteen years of age at the time an injury occurs, he is under a legal disability for limitations purposes. *See* TEX.CIV.PRAC.&REM.CODE ANN. § 16.001(a)(West 2002). In such cases, claims for injuries suffered during childhood are deemed to accrue on the plaintiff's eighteenth birthday. *See id*. at § 16.001(b).

The determination of when a cause of action accrues is a question of law. *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex. 1990). Here, Doe's claims include negligence, breach of fiduciary duty, and intentional infliction of emotional distress against Msgr. Rowland and vicarious liability and negligence against the Diocese. Ordinarily the two-year personal injury statute of limitations applies to negligence and intentional infliction of emotional distress claims, and claims for breach of fiduciary duty are governed by a four-year statute of limitations. *See* TEX.CIV.PRAC.& REM.CODE ANN. §§ 16.003(a); 16.004(a)(5)(West 2002); *see* TEX.CIV.PRAC.&REM.CODE ANN. §16.051 (West 2008); *Snyder v. Eanes Independent School Dist.*, 860 S.W.2d 692, 699 (Tex.App.-- Austin 1993, writ denied). However, a five-year statute of limitations applies where the plaintiff brings suit for personal injury caused by sexual assault or aggravated sexual assault.[8] *See* TEX.PRAC.&REM.CODE ANN. §16.0045(a).

It is undisputed that because Doe was a minor, his cause of action did not accrue until his eighteenth birthday on January 4, 1966. *See* TEX.PRAC.&REM.CODE ANN. §16.001(a)(1). He did not file suit until June 2006, more than forty years later. Regardless of which limitations provision applies, absent an applicable tolling provision, limitations ran on or before January 4, 1971.

**DURESS**

The first question is whether a genuine issue of material fact exists with respect to whether

---

[8] Other courts have applied this five- year statute of limitations period to claims of negligence as well as claims of vicarious liability based on the commission of the intentional tort. For example, in *Stephanie M. v. Coptic Orthodox Patriarchate Diocese of Southern U.S.*, No. 14-10-00004-CV, 2011 WL 1761353, at *1 (Tex.App.--Houston [14th Dist.] Mar. 17, 2011, no pet.), the court addressed whether Section 16.0045 should be construed to apply to claims against defendants who did not physically assault the plaintiff but whose negligence proximately caused the sexual assault. *Stephanie M.*, 2011 WL 1761353, at *2. There, a parishioner appealed the trial court's order granting summary judgment on the parishioner's claims alleging negligence in allowing a priest to sexually assault her. *Stephanie M.*, 2011 WL 1761353, at *1. The order was predicated upon the two-year negligence statute rather than the five-year statute applicable to certain sexual assault cases. *Id.* The Houston Court of Appeals reversed and remanded, holding that because the negligence action arose out of the intentional sexual assault allegedly committed by the priest, the five-year statute of limitations applied. *Id.*; *see also Doe v. Catholic Society of Religious and Literary Educ.*, No. H-09-1059, 2010 WL 345926, at *16 (S.D.Tex. Jan. 22, 2010)(five-year limitations period may apply to other claims as well, particularly the direct liability claims that the defendants' negligence allowed the alleged abuse to occur).

the threats made by Msgr. Rowland and Father Hay, during and immediately after the sexual assaults, constitute duress sufficient to prevent Doe from timely filing his suit.

Doe submitted summary judgment evidence from Father Doyle, Dr. Benkert, and Dr. Foote. Both Father Doyle and Dr. Benkert have long studied the concept of duress in a religious context. Together the two published an article on the psychological impact on victims of clergy sexual abuse. They explained the concept of religious duress as similar to ordinary duress in that it involves some improper conduct which is intended to, and does, interfere with a person's free will and judgment. However, religious duress involves an internal constraint or threat experienced by people due to their beliefs.

According to Dr. Benkert, she was asked to render an opinion concerning the potential role of religious duress in John Doe's inability to come forward regarding his sexual abuse prior to 2006 when he filed his lawsuit. Although she never met with or personally evaluated Doe, she reviewed several of his personal records before preparing her report. Dr. Benkert rendered the following opinions:

> All the elements of Religious Duress are manifested in the case of [Doe]. He was an adolescent from a pious and religious Roman Catholic family that viewed the priest as above reproach--completely trustworthy. They allowed their son to spend time with the priests at their parish church where he served as an altar boy several times a week. [Doe] trusted the priests of the parish and initially trusted Fr. Hay until he sexually abused and betrayed him. He then became fearful. When he reported the abuse to the pastor who still merited his confidence he was told to ***be quiet or you will get yourself into hot water***. [Doe] felt he had nowhere to turn and he was overwhelmed and constrained out of mortal fear to follow Fr. Rowland's admonition. [Doe] had been warned and threatened by the priest who held the power of heaven and hell in his hands not to tell anyone about the abuse. This warning carried with it not simply the power of a person, but the validation of a clerical culture--a reality too powerful to resist. The resulting fear, awe, and respect of all Catholic clergy with their special religious and social status within his Catholic experience makes religious duress possible and effective. [Emphasis in original].

> It is my professional opinion that [Doe] is the victim of Religious Duress. In my

experience, it takes many years of therapy and/or personality growth and development to overcome the constraints and fear that keep such a person from coming forward to acknowledge their sexual abuse. Most men and women who were abused as minors by priests can never come forward publicly. It took many years of professional help before [Doe] could even acknowledge the abuse to a therapist. It took several more years before he was psychologically able to acknowledge it publicly. These are all effects of Religious Duress.[9]

Dr. Foote, a forensic and clinical psychologist, evaluated Doe at the request of Doe's attorney for the purpose of determining "the presence of emotional problems . . . which may have been related to events which occurred when he was a child." According to Dr. Foote's evaluation:

[Doe's voluntary return to the apartment after the first instance of abuse] started for him 'the myth of complicity,' in which he believed himself to be an active accomplice in his abuse. The sense that he is complicit in his own abuse has augmented his sense of shame and has made it so shameful for him that he has never even told his wife of some 35 years about his sexual abuse experience. Even though he has been in treatment with mental health professionals, he had not disclosed this abuse to them until 2004.

This case is complicated by [Doe's] history of being raised in a home in which there was significant domestic violence. . . . This history of abuse made him even more vulnerable to sexual exploitation by a priest. His expectation was that the priest would be a benign adult who would take care of him and treat him with respect rather than making him an object of sexual abuse.

At the time of this evaluation, [Doe] shows continuing evidence of a Major Depressive Disorder, which first became evident in about 1997. [Doe] dates this emergence of depression to the death of his mother along with his memories of his abuse experiences. If one assumes that he was sexually abused by Father Hay, it is my professional opinion that [Doe's] reduced self image, constant concern about being homosexual and other self-deprecatory ideas mark his depression as a result of this sexual abuse.

In addition, [Doe] shows some elements of a post-traumatic stress disorder. Although he would probably not meet the criteria for full PTSD . . . If one assumes that his allegations of abuse by Father Hay are true, the post-traumatic symptoms are, in my professional opinion, causally related to this experience of clergy sexual abuse.

Next, Dr. Foote set out five factors leading to delayed disclosure of the sexual abuse. First,

---

[9] Father Doyle's report details the heirarchy of the Catholic Church and the duties of each of the officials but it provides only a background of Doe's history and fails to provide any relevant application of facts.

Doe felt responsible for what happened. His "self-blame" was increased by his fear that his participation meant he was homosexual. Doe knew what Father Hay did to him was wrong in a moral sense. He attempted to prevent it from happening again by reporting it to Msgr. Rowland, but:

> This report resulted in his being told that he should tell no one. If this event is true, the sole individual to whom this child believed he could report the abuse used his authority to instill greater fear into this child and to silence him. [Doe] recalls some degree of relief that the supervising priest did not tell his father about the report.

Fourth, Doe's childhood fear of punishment from his father, were he to tell him about the abuse prevented him from coming forward. Finally, "because his shame and fear prevented him from reporting his abusive experience to medical and mental health professionals, his problems were variously diagnosed as having other etiologies, and treated accordingly. This failure to pair his abuse with the resulting post-traumatic and depressive symptoms also effectively prevented him from pairing a tort with its damages. Without that pairing, seeking legal remedies for his distress made no sense."

### *Applicable Law*

Generally, duress is any coercion, whether mental, physical, or otherwise, which causes another person to act contrary to his or her own free will or to submit to a situation or a condition against his or her own volition or interest. *Pierce v. Estate of Haverlah*, 428 S.W.2d 422, 425 (Tex.Civ.App.--Tyler 1968, writ ref'd n.r.e.). Stated differently, duress is the deprivation by one person of another by putting the other in fear, in order to obtain some valuable advantage from the other. *Gray v. Freeman*, 37 Tex.Civ.App. 556, 84 S.W. 1105, 1107-08 (1905). To constitute duress, the threat must be of such character to overcome the willpower of a person and cause them to do what he or she otherwise would not.

In actions based on duress, the operation of the statute of limitations is tolled until the time

that duress ceases to exist. *See Pierce*, 428 S.W.2d at 422; *McNeil v. Lovelace*, 529 S.W.2d 633, 636-37 (Tex.Civ.App.--Fort Worth 1975, no writ). Upon removal of the duress, the statute begins to run. *McNeil*, 529 S.W.2d at 637.

The question of what constitutes duress is a matter of law. *Pierce*, 428 S.W.2d at 425. However, the question of whether duress exists in a particular situation is generally a question of fact dependant upon all the circumstances and the mental effect on the party claiming duress. *Id.*

### *Application of Law to Facts*

To defeat summary judgment based on duress, Doe must demonstrate by more than a scintilla of evidence that the statements by Father Hay or Msgr. Rowland deprived him of his free will and judgment and that the duress consistently prevented him from bringing his claim from the time he reached eighteen until he filed suit in June 2006. Doe points to two improper threats which robbed him of his ability to take legal action: (1) Father Hay's statements that he was the Son of God and that everything he touched was sacred; and (2) Msgr. Rowland's instructions to keep quiet or Doe would get in trouble. Doe reasons that these threats were made under the reverential authority afforded to priests in an effort to make sure he never pursued a claim. In other words, the duress occurred because of the exploitation of the priests' authority.

Doe relies on the testimony of Father Doyle and Dr. Benkert.[10] Based on the expert reports,

---

[10] Doe contends the expert testimony of Doyle and Benkert, standing alone, is sufficient to create a fact issue as to whether duress tolled limitations and proof that the trial court erred in finding his claims barred as a matter of law. In support of the foregoing statement, he directs us to *Doe v. Garcia*, 5 F.Supp.2d 767, 770-71 (D.Ariz. 1998) as "holding that duress by high school vice principal upon a student he had sexually abused defeated summary judgment on a statute of limitations defense." While the quote may correctly state the holding, that case is highly distinguishable and hardly favorable to Doe's argument.

Jane Doe brought claims against her former vice principal, the school district, and the school district's superintendent arising from an alleged sexual relationship between Doe and her vice principal. *Doe v. Garcia*, 5 F.Supp.2d at 769-70. In Arizona, as in Texas, Doe's cause of action did not begin to accrue until she reached the age of majority. *Id.* at 770. In that case, the applicable statute of limitations was two years and Doe didn't bring suit until two years and eleven months after she turned eighteen. *Id.* The vice principal and the district filed motions to dismiss claiming that Doe's actions were time barred. *Id.* at 767. The district court refused to grant the motion holding that although, if uncontradicted, the evidence as to the dates of the abuse, Doe reaching majority and Doe filing suit would

Doe claims he suffered a specific type of duress identified as "religious duress."[11] He suggests that duress in a religious context is similar to ordinary duress but it involves "an internal constraint or threat experienced by people due to beliefs." According to Doe, the constraint on a person's free will that comes from religious duress is based on two elements:

> (1) the objective or general level of Church teaching which the individual experiences through various levels of religious education, participation in religious rituals or liturgies and living in a Catholic-based culture, and

> (2) the direct experience of the individual with priests or bishops whose words or actions have caused the person to believe that the religious figure had power over

bar her claims, Doe's allegations were sufficient to raise a question of material fact as to whether the vice-principal's actions constituted duress sufficient to toll the applicable limitations period under Arizona law. *Id*. The appellate court affirmed this decision. *Id.* The law in Arizona, as stated in *Garcia*, is similar to that in Texas with respect to duress as a tolling statute. *Compare Doe v. Garcia*, 5 F.Supp.2d at 770 ("[I]n order to establish duress, a plaintiff must do more than simply allege a subjective fear that retaliation might occur. A plaintiff must show some act or threat by the defendant that precluded the exercise of her free will and judgment and prevented her from exercising her legal rights."), *with Pierce*, 428 S.W.2d at 425 (in order to establish duress, a plaintiff must demonstrate some act of coercion, whether mental, physical, or otherwise, which caused her to act contrary to her own free will or to submit to a situation or a condition against her own volition or interest). In the case at bar, Doe would likely end the comparison between his case and *Doe v. Garcia* after the above information. However, the facts in *Garcia* which the Court expressly relied on in reaching its conclusion are clearly distinguishable.

In *Garcia*, Doe's affidavit presented more than a subjective fear her vice-principal would retaliate against her should she report him where the affidavit alleged the following facts in support of the claimed duress: (1) her vice principal gave her special attention, gifts, money and excused her from class which developed into a sexual relationship lasting approximately five years; (2) during the relationship, her vice-principal continually threatened to kill himself if Doe reported him and testified she truly believed he would hurt himself or her if she told anyone about their relationship; (3) the vice-principal was hot tempered; (4) he repeatedly showed Doe his hand gun; (5) he would follow her, pulled her out of class to visit him, telephoned her telling her that he knew what time she woke up and when she went to sleep; (6) on two occasions, he appeared outside and tapped on her bedroom window; (7) he paged her constantly to find out where she was and who she was with; (8) once Doe left high school and he lacked the same control over her, he told her that he became friends with her boyfriend to keep track of her; and (9) after her boyfriend died in his home under "mysterious circumstances" and he (the vice-principal) called her and made comments implying he was somehow involved in her boyfriend's death. *Id*. at 770-71. The relationship with her vice-principal and the comments he made about her boyfriend's death both happened in January 1997, approximately six months after the statute of limitations expired (and two and a half years after she turned eighteen). *Id*. at 771. Doe filed suit approximately four months later.

Here, we have a single statement by Msgr. Rowland and presumably two instances in which Father Hay made the same statement, each of which Doe argues is sufficient to toll the statute of limitations for over forty years. While the priests may have had great control over Doe while he was a minor and an altar boy, as the vice-principal did in *Garcia*, here there is no evidence of any statements or threatening behavior after Doe reached the age of majority and certainly not continuously over the past forty years.

[11] The Diocese asserts that "religious duress" is a concept developed by Doe's experts and does not constitute legal duress. The Diocese further argues that there is no evidence the duress was caused by the Diocese, Doe's experts were not qualified to render an expert opinion on the issue, and Doe's experts' opinions were not supported by the evidence.

them.

Doe points to the following facts in support of his religious duress claim. He was raised in a devout Catholic family. His father was very strict and deeply religious. Doe was an altar boy which was a status honoring his family. His family believed the Church's teachings that priests and bishops were superior, they had a duty to obey them, and that to disobey a clergy member could constitute a mortal sin. In his brief, Doe also maintains that Catholic children are taught from an early age that clerics are special, unique, removed, powerful and deserving of deference, awe, and unquestioned respect.

Doe is using this theory of religious duress to create a fact issue as to whether, because of his view of the priests and his religious beliefs, the threats sufficiently deprived him of his free will thereby tolling limitations. Even if we assume that a genuine issue of material fact exists with respect to whether the threats made by Msgr. Rowland are sufficient to meet the definition of duress, Doe must still demonstrate that the threats were of such a continuous nature as to prevent him from filing suit within the applicable limitations period. *See Pierce*, 428 S.W.2d at 422. We find no such evidence. Doe's allegation of a subjective fear that some retaliation might occur based on his religious beliefs is insufficient to establish duress. *See Smith v. Estate of Kelly*, 343 N.J.Super. 480, 778 A.2d 1162, 1173 (N.J.Super.A.D. 2001)("Duress may take the form of moral compulsion or psychological pressure. Yet, even moral compulsion or psychological pressure are not wrongful unless they are 'so oppressive under given circumstances as to constrain one to do what his free will would refuse.'" [Internal citations omitted.]). Doe must not only demonstrate some act or threat by Appellees that prevented him from exercising his legal rights, but also that the threatening behavior *continued on into his majority*. Doe failed to present any evidence that the duress continued throughout the forty years it took him to file suit. With respect to the threat by Msgr. Rowland, Doe

describes only one encounter, which is insufficient to show the threat was continuous in nature. *See Pierce*, 428 S.W.2d at 427. Similarly, Doe had no contact with Father Hay after he stopped serving mass with him. Doe left the church in 1972. After his father's death in 1996, Doe would have logically overcome the fear of retaliation based on his father's religious beliefs. Doe offers no explanation as to the duress he experienced between his father's death and when he consulted the first attorney in 2003, or filed his lawsuit in 2006, nor has he named the event that enabled him to overcome the duress he experienced. *See Doe v. Holy See*, 17 A.D.3d 799, 800, 793 N.Y.S.2d 571 (N.Y.App. 2005)(plaintiff's argument that the statute of limitations should be tolled based on a doctrine of "religious duress" is untenable both because he failed to show that the claimed duress continued after he reached the age of majority and because our recognition of the doctrine, grounded in the teachings of the Catholic Church, would require us to venture into forbidden ecclesiastical terrain); *see also Estate of Kelly*, 778 A.2d at 1175 ("The question is what did defendants do to prevent plaintiff from asserting that claim against them upon reaching age eighteen. . . . The answer is nothing."). We conclude there is no genuine issue of material fact concerning duress.

## UNSOUND MIND

The law provides that a person of unsound mind is under a legal disability which tolls the statute of limitations. *See* TEX.CIV.PRAC.&REM.CODE ANN. §§ 16.001, 16.003; *see Grace v. Colorito*, 4 S.W.3d 765, 769 (Tex.App.--Austin 1999, pet. denied). Here, Doe argues a fact issue exists as to whether limitations is tolled under Texas Practice and Remedies Code, Section 16.001 "because he was emotionally and mentally incapacitated and of an unsound mind to bring suit against [the Diocese and Rowland] at the time the causes of action accrued." Texas Civil Practice and Remedies Code Section 16.001 provides in relevant part:

(a) For the purposes of this subchapter, a person is under a legal disability if the

person is:

.    .    .

     (2) of unsound mind.

     (b) If a person entitled to bring a personal action is under a legal disability when the cause of action accrues, the time of the disability is not included in a limitations period.

TEX.CIV.PRAC.&REM.CODE ANN. § 16.001. The purpose of Section 16.001(a)(2) is to protect a person of unsound mind by insuring that a legally disabled person's right to bring suit will not be precluded by a statute of limitations, prior to removal of the disability. *Ruiz v. Conoco, Inc.*, 868 S.W.2d 752, 755 (Tex. 1993). The tolling provision applies to a person who suffers from an inability to participate in, control, or understand the progression and disposition of their lawsuit. *Id.* Although generally speaking, persons of unsound mind and insane persons are synonymous, a person may be of unsound mind without having been adjudicated incompetent. *Hargraves v. Armco Foods, Inc.*, 894 S.W.2d 546, 547 (Tex.App.--Austin 1995, no writ).

When the non-movant asserts a tolling statute (such as Section 16.001) in response to a motion for summary judgment, the limitations defense is not conclusively established until the movant negates the applicability of the tolling provisions. *See Hargraves*, 894 S.W.2d at 547. In other words, Doe must prove that he was of unsound mind during the relevant time period. *See Wagner v. Texas A & M University*, 939 F.Supp. 1297, 1317-18 (S.D.Tex. 1996)("It is the plaintiff's burden to show that he is of unsound mind and to demonstrate when such period of disability ended, if not ongoing.").

On appeal, the Diocese and Msgr. Rowland each argue that the only evidence relevant to this issue is contained in the affidavit of Dr. Charles Clark which concludes that Doe was not of unsound mind. The Diocese also argues that Doe's own experts do not support his contention because: (1)

Dr. Benkert's affidavit affirmatively states Doe was *not* of unsound mind; and (2) Dr. Foote's testimony fails to state Doe *was* of unsound mind.

Doe acknowledges that Dr. Benkert's affidavit states that Doe is not of unsound mind. But he counters that her opinion relates to his present condition and emphasizes that she did not state that he was never of unsound mind. Doe also maintains that Dr. Foote's report directly addressed whether Doe formerly suffered from unsound mind and noted that he was unable to even report the abuse until 2004. Finally, Doe recognizes the opinions of Dr. Clark and Dr. Foote are in conflict, but he contends that the contradiction only provides further support for his argument that the issue of unsound mind cannot be resolved as a matter of law.

The unsound-mind exception tolls the general statute of limitations for two reasons: first, to protect persons without access to the courts, and second, to protect persons who are unable to participate in, control, or understand the progression and disposition of their lawsuit. *Hargraves*, 894 S.W.2d at 548. To prevent summary judgment, the non-movant needs to produce specific evidence that would enable the court to conclude that he did not have the mental capacity to pursue litigation for a definite period of time, or produce a fact-based expert opinion to that effect. *See Grace*, 4 S.W.3d at 769; *Porter v. Charter Medical Corp.*, 957 F.Supp. 1427, 1438 (N.D.Tex. 1997); *Freeman v. American Motorists Ins. Co.*, 53 S.W.3d 710, 713 (Tex.App.--Houston [1st Dist.] 2001, no pet.).

On appeal, Doe's entire argument rests on Dr. Foote's report. According to Dr. Foote, a number of factors "combined to result in [Doe's] inability to go forward with this litigation."

• Doe felt responsible for what happened;

• Doe feared that his participation was a sign he was homosexual;

• the fear instilled in him by Msgr. Rowland after reporting the abuse;

• fear of his father; and

• fear and shame which prevented him from reporting the abuse to medical and mental health professionals.

The report fails to mention when this disability began and certainly does not address whether Doe was incapacitated at the time the cause of action accrued. Doe testified that he had no issues with depression, concentration, or nightmares until his mother passed away in 1996, some thirty years after the cause of action accrued. Since Doe attained majority, he served in the Army and received awards for his service; he worked, including one job which lasted for eleven years; he earned an associates degree from El Paso Community College and attended several classes at UTEP, he has been married to the same woman since 1972, and he has five children. All of these actions tend to show Doe was of sound mind. Finally, the only other reference to Doe's unsound mind is the testimony of Dr. Clark and Dr. Benkert, both of which specifically state that Doe is not legally incapacitated.

Even taking Doe's assertions as true, which we must, the evidence fails to rise to the level of incapacity required under the doctrine of unsound mind. We thus conclude that Doe presented no evidence showing that during this relevant period he was somehow incapable of participating in and controlling a law suit. *See Grace*, 4 S.W.3d at 770; *see also Doe v. Henderson Independent School Dist.*, 237 F.3d 631, 2000 WL 1701752, at *5 (5th Cir. 2000)(noting that Texas courts have generally denied tolling based on the unsound mind theory where a plaintiff is able to assert his legal rights, the Fifth Circuit affirmed the district court's decision denying tolling on this basis, noting that the plaintiffs had held down jobs, been married, and participated in legal proceedings).

## EQUITABLE ESTOPPEL

Finally, we address Doe's contention that he raised a fact issue as to whether the Appellees

were equitably estopped from asserting limitations as a defense. The Diocese and Msgr. Rowland argue that equitable estoppel does not apply, primarily relying on the fact that through Doe's own admission, he never forgot the assaults.

The doctrine of equitable estoppel requires (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations. *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515-16 (Tex. 1998); *Dean v. Frank W. Neal & Associates, Inc.*, 166 S.W.3d 352, 357-58 (Tex.App.--Fort Worth 2005, no pet.). Estoppel in avoidance of limitations may be invoked in two ways: a potential defendant conceals facts that are necessary for the plaintiff to know he has a cause of action; or, the defendant engages in conduct that induces the plaintiff to forego a timely suit regarding a cause of action that the plaintiff knew existed. *Rendon v. Roman Catholic Diocese of Amarillo*, 60 S.W.3d 389, 391 (Tex.App.--Amarillo 2001, pet. denied); *Dean*, 166 S.W.3d at 358. On appeal, John Doe argues the latter applies.

To raise a fact issue on his estoppel conduct claim, Doe must have presented some evidence that the Appellees' conduct affirmatively induced him into delaying suit beyond the limitations period, and that such delay in filing was not due to any want of diligence on Doe's part. *See Rendon*, 60 S.W.3d at 391; *Ladd v. Knowles*, 505 S.W.2d 662, 669 (Tex.Civ.App.--Amarillo 1974, writ ref'd n.r.e.). "Implicit in this test are the requirements that the plaintiffs knew they had a cause of action, that the cause of action had accrued at the time the inducement occurred, and that their initial and continued reliance upon the original inducement was reasonable." *Dean*, 166 S.W.3d at 358 *citing Rendon*, 60 S.W.3d at 391. Otherwise stated:

[T]o estop defendant, he must have done something that amounted to an affirmative

inducement to plaintiff to delay bringing the action. Statements calculated to dissuade a litigant from beginning action and not designed merely to induce its postponement will not, in the absence of fraud, estop the party making them from availing himself of the plea of the statute of limitations in the event of subsequent prosection [sic] of such action.

*See Squyres v. Christian*, 253 S.W.2d 470, 472 (Tex.Civ.App. 1952), *quoting* 53 C.J.S., Limitations of Actions, s 25, p.966.

In *Rendon*, children allegedly molested by a Catholic priest sued based on one bishop's failure to take action against the priest. *Rendon*, 60 S.W.3d at 389. The Amarillo Court rejected the plaintiff's assertion of estoppel as a defense to the statute of limitations where the bishop represented to the victims' father that he would "take action to take care of the matter," and that "the Church would take care of the Boys, protect the other children from [the abusive priest], and that legal action would be unnecessary." *Id*. at 390-91. In affirming the trial court's summary judgment, the court noted that:

> Without evidence that anything more than the mere disclosure of criminal conduct occurred between [the victims' father] and [the Bishop], without reference to a discussion about a claim, suit, redress or compensation of any kind, we lack sufficient evidentiary foundation from which to reasonably infer that a promise to 'take action' comprised inducement to delay initiation of a *civil suit*. [Emphasis in original.]

*Rendon*, 60 S.W.3d at 392.

Neither Father Hay's claim that he was God nor the warning by Msgr. Rowland is sufficient to delay suit beyond the applicable statutory periods of limitation. *See Rendon*, 60 S.W.3d at 392; *see also Squyres*, 253 S.W.2d at 472 (statements calculated to dissuade a litigant from beginning action and not designed merely to induce its postponement will not, in absence of fraud, estop the party making them from availing himself of the plea of the statute of limitation). None of the alleged threats reference civil action, redress, or compensation. Doe admits he had knowledge of the facts

giving rise to his claims. In fact, he knew the abuse was wrong when it happened and he has never forgotten it. Consequently, equitable estoppel does not apply. *See Doe v. Linam*, 225 F.Supp.2d 731, 736-37 (S.D.Tex. 2002).

We overrule Issue One and affirm the judgment of the trial court.


September 21, 2011

ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, J., and Gomez, Judge
Gomez, Judge, sitting by assignment