COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS





JOHN DOE,

                                    Appellant,

v.

THE CATHOLIC DIOCESE OF
EL PASO and MSGR. THOMAS
ROWLAND,

                                    Appellees.

§
 
§
 
§
 
§
 
§

§


No. 08-09-00283-CV

Appeal from
 County Court at Law No. 3

of El Paso County, Texas

(TC # 2006-2747)



 

 

 





O P I N I O N

            John Doe, a former altar boy, filed suit against Msgr. Thomas Rowland, the supervisory
priest, and The Catholic Diocese of El Paso. The trial court granted summary judgment in favor of
the Appellees. Because Doe’s causes of actions are barred by limitations, we affirm the judgment
of the trial court. 
FACTUAL BACKGROUND
            John Doe was born on January 4, 1948. When he was approximately sixteen years of age,



he was sexually abused by Father Hay. Three incidents occurred during the summer of 1963 or 1964
while Doe served as an altar boy at Our Lady of the Light, a parish within the Diocese. At that time,
Msgr. Rowland was the head priest at the church.


 Father Hay was not regularly assigned to the
church, but he occasionally filled in and gave mass on Sundays. 
The Incidents
            One Sunday after Father Hay served the five o’clock mass, he invited Doe and two other altar
boys to get hamburgers at a local restaurant. After picking up the food, Father Hay took the boys to
his apartment where they could watch television. He then filled the bathtub with water and asked
the boys to take off their clothes and “come swimming.” The boys complied. Father Hay joined the
boys in the tub and began splashing and playing with them. At some point during the horseplay,
Father Hay forced Doe to stand up, shoved him against the wall, and anally penetrated him while the
other boys watched. After Father Hay finished, Doe climbed out and put on his clothes. He sat in
the other room, trying to focus on the television, but through the open door, he saw Father Hay
perform oral sex on the other two boys. Eventually Father Hay gave the three a ride back to the
church parking lot. 
            A few weeks later, the boys again served five o’clock Sunday mass with Father Hay. Once
more, Father Hay took them to get hamburgers and then back to the apartment. This time, Father
Hay performed oral sex on Doe and penetrated the other two boys. The third and final incident also
occurred on a Sunday after five o’clock mass. This time, Doe remained clothed and watched
television in the living room, but witnessed the two other boys naked in the bathtub with Father Hay. 
Thereafter, Doe stopped serving mass with Father Hay. 
            Doe initially kept quiet about the first incident of sexual abuse. He knew it was wrong when
it happened, but he was confused and felt as though it might have been his fault. 
            Q. But you knew it was wrong and you didn’t tell anybody? 
 
A. No, sir. I take that back, sir. When that happened, there was a space, and I did
tell -- me and the other alter [sic] boy. I told him, You know what, we should tell
Father Roland what happened. And he said, No. And I said, Yes. We had to -- we
had mass on Wednesday, and Father Roland was there. So when we were in the
rectory, I asked him, Father Roland, after mass, can we talk to you? He says, Yeah,
okay.
 
When the mass was over, we talked to him. And he said, What’s going on? And we
asked him, Father Roland, something happened to us with Father Hay. He did sex
with us. He got, like, aggravated and told me, You kids, you’re going to be quiet or
you’re going to get yourselves in hot water. After that I said, Forget it. 

After the first incident, Doe was afraid, but he went with Father Hay a second time because he was
hungry and confused. He also said he was afraid of Father Hay because “[h]e told me he was God.” 
                                                      Doe’s Personal Background
            Doe was raised in the Catholic Church. His father was a very strict disciplinarian who
routinely beat Doe with a belt. Doe was about eleven years old when he began serving as an altar
boy. He continued to serve until he was drafted into the Army. 
            During his military service, Doe received the Soldier of the Year Award. In 1971, he was
honorably discharged and went into the reserves with the Army National Guard. In June 1974, Doe
was again honorably discharged. He returned to the church looking for Father Hay


 in order to
confront him and “get even.”


 
             Doe ultimately left the Catholic Church and became a member of the Pentecostal Church. 
He married and has raised his children in the Pentecostal faith. His mother passed away in 1994 or
1995 and his father died around 1996. Doe never told either one of them about the abuse because
he feared his father would beat him. And he never reported it to the police because he was afraid
it would end up in the newspaper and he was embarrassed.
            Sometime after his mother’s death, Doe sought medical help for depression from a civilian
psychiatrist, Dr. Patel, who helped him obtain Social Security disability benefits, Veteran’s
Administration Benefits, and access to VA medical care. The visit to Dr. Patel was the first time
Doe sought treatment for any psychiatric or psychological problems. According to Doe’s
employment records, he received his last paycheck in May 1996, at which point he “just quit. I could
not handle it anymore. I was getting depression and stuff like this.” He has not returned to work. 
                                                PROCEDURAL BACKGROUND
            Doe filed his original petition in June 2006, alleging that Father Hay had committed torts of
assault and battery, intentional infliction of emotional distress, breach of fiduciary duty, and 
negligence. He alleged negligence and vicarious liability against the Diocese and negligence, breach
of fiduciary duty, and intentional infliction of emotional distress against Msgr. Rowland. The
Diocese and Msgr. Rowland filed general denials and asserted various affirmative defenses,
including limitations. Thereafter, both parties filed hybrid motions for summary judgment. 
            Doe filed responses to the motions for summary judgment and amended his petition. With
regard to Msgr. Rowland, he alleged negligence, breach of fiduciary duty, and intentional infliction
of emotional distress. With respect to his negligence claims, Doe alleges five specific acts. 
 

            • failing to report the sexual abuse to Bishop despite the Diocese’s policy to do so; 

            • failing to report the sexual abuse to the authorities; 
 
• fraudulently concealing the tortious conduct of Father Hay by misrepresenting that if Doe
went forward with his allegations, he would suffer negative consequences; 

            • engaging in a cover-up to avoid church accountability and negative publicity; and
 
 • failing to inform Doe’s parents that Father Hay was a “sexual threat to their child.” 

            Additionally, the amended petition alleged claims for vicarious liability and negligence
against the Diocese. Doe claimed the Diocese is vicariously liable for the conduct of Msgr. Rowland
because the latter was acting within the course and scope of his employment and because the
Diocese, as employer and principal, aided in the commission of the torts. As to negligence, Doe
alleged:
• negligent recruiting, hiring, and supervision of priests; 

            • failing to inform parents that certain priests were sexual threats; 
 
• ignoring warnings from medical professionals even within the Catholic Church that certain
priests were potentially sexually dangerous to children; 
 
• misrepresenting facts to victims who requested information about such priests in order to
fraudulently conceal the Diocese’s own negligence; 
 
• failing to alert parishioners, previous parishes and the surrounding communities where
abusive seminarians, deacons, and priests had served that they were exposed to known or
suspected child molesters; 
 
• ignoring warnings from other members of the clergy who believed that such priests were
threats to children; 
 
• failing to report the crimes committed by priests to law enforcement officials and
obstructing or interfering with law enforcement investigations concerning abusive priests; 
 
• making decisions revealing the interests of the abusive priests and the Church’s desire to
avoid scandal, were vastly superior to the interests of the victims; 
 
• using the church’s influence to alter the outcome of the criminal legal process relating to
priests who had been engaging in illegal sexual acts and conspiring to “spirit” such priests
out of the state or country so that the church could avoid liability and accountability to civil
authorities and their victims and the church could “recycle [the priests] back into active
ministry elsewhere;” 
 
• fostering an environment and culture where abuse of children could flourish and in which
it was clearly understood that there was no corporate accountability for criminal acts toward
children;” and 
 
• failing to enact policies and procedures to prevent such sexual abuse by priests. 

            Doe claimed the applicable statute of limitations was tolled because of “psychological
coercion . . . constituting duress,” equitable estoppel, and quasi estoppel. Finally, he contended that
Texas Practice and Remedies Code Section 16.001 tolled limitations because he was emotionally
and mentally incapacitated and of unsound mind at the time the causes of action accrued. On appeal,
the only issues before us are whether duress, unsound mind, or equitable estoppel operate to defeat
limitations. 
THE EVIDENCE
            Doe tendered his own deposition; a paper written by Father Thomas Doyle and Dr. Marianne
Benkert on the effect of religious duress on victims of clergy sexual abuse; an affidavit, curriculum
vitae, and report of Father Doyle; an affidavit by Dr. Benkert; and a report by Dr. William Foote,
Ph.D. Appellees objected to portions of Doyle’s affidavit, curriculum vitae, and report; the article
written by Doyle and Dr. Benkert; Dr. Benkert’s affidavit; and Dr. Foote’s report.



 

THE HEARINGS
Proceedings Before Judge Alvarez
            This case was originally heard by Judge Javier Alvarez. On January 26, 2009, he granted via
letter the Diocese’s motion for summary judgment on limitations only. Three days later, the
defendants each filed their objections and motions to strike Doe’s summary judgment evidence. On
February 2, Judge Alvarez sustained those objections and, via e-mail, granted Msgr. Rowland’s
motion for summary judgment on limitations. All of the foregoing was done without a hearing. 
            On February 26, Doe filed a motion for reconsideration. The next day, Judge Alvarez held
a hearing on the defendants’ motion for entry of final judgment. Upon Doe’s request, Judge Alvarez
allowed him to file a response to the expert witness objections. On March 3, Judge Alvarez issued
an order finding that live testimony of experts was unnecessary but allowing Doe two weeks to
submit affidavits of its experts demonstrating admissibility standards under Rule 702. Meanwhile,
a separate order was issued on March 11 sustaining both defendants’ objections to Dr. Foote’s
report.


 Doe filed his response on March 13 addressing the qualifications of Father Doyle and
Dr. Benkert to render expert opinions but the response did not address Dr. Foote’s report. On March
24, Judge Alvarez signed an order granting summary judgment and an order sustaining the
defendants’ objections to Dr. Benkert and Father Doyle. Neither of these orders references Dr.
Foote. 
            Doe then filed a motion to recuse Judge Alvarez and a motion for a new trial. Judge Alvarez
voluntarily recused himself and Regional Administrative Judge Steve Ables appointed himself to
preside over the case. 
Proceedings Before Judge Ables
            On May 15, Judge Ables denied Doe’s motion for a new trial but granted his motion for
reconsideration.


 He held a hearing on June 17 to address the defendants’ objections to Father Doyle
and Dr. Benkert. In Judge Ables’ own words, the purpose of hearing was to determine, “whether
or not their methodology is appropriate, whether or not they’re reliable and we should consider their
testimony.” Both Doyle and Benkert testified at the hearing and Judge Ables ruled the testimony
was admissible. Following a second hearing limited to arguments of counsel, Judge Ables granted
both motions for summary judgment. This appeal follows. Doe complains that summary judgment
was improper because he raised genuine issues of material fact as to whether his claims are time
barred and as to the alleged negligence of the Diocese and Msgr. Rowland. Because we find Issue
One dispositive of the case, we need not address Issue Two. 
STANDARD OF REVIEW
            The standard of review for a traditional summary judgment asks whether the movant carried
the burden of showing that there is no genuine issue of material fact such that judgment should be
granted as a matter of law. See American Tobacco Co., Inc. v. Grinnell, 951 S.W.2d 420, 425 (Tex.
1997). Summary judgment is proper if the defendant disproves at least one element of each of the
plaintiff’s causes of action or establishes all elements of an affirmative defense to each claim. D.
Houston, Inc. v. Love, 92 S.W.3d 450, 454 (Tex. 2002); Shah v. Moss, 67 S.W.3d 836, 842 (Tex.
2001). Once the movant establishes a right to judgment as a matter of law, the burden shifts to the
non-movant to produce evidence raising a genuine issue of material fact. City of Houston v. Clear
Creek Basin Authority, 589 S.W.2d 671, 678-79 (Tex. 1979). 
            In deciding whether there is a disputed material fact issue precluding summary judgment, we
take as true all competent evidence favorable to the non-movant, and we indulge every reasonable
inference and resolve any doubts in the non-movant’s favor. Southwestern Elec. Power Co. v. Grant,
73 S.W.3d 211, 215 (Tex. 2002), citing Science Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911
(Tex. 1997). Evidence favoring the movant’s position will not be considered unless it is
uncontradicted. Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co., 391 S.W.2d 41,
47 (Tex. 1965). 
            In the case of an affirmative defense such as limitations, the movant must establish all the
elements of an affirmative defense as a matter of law. City of Houston, 589 S.W.2d at 678; Velsicol
Chemical Corp. v. Winograd, 956 S.W.2d 529, 530 (Tex. 1997). If the plaintiff’s pleadings do not
affirmatively show that the limitations period has run, the movant has the burden of proving that the
suit is barred by limitations as a matter of law. Gibson v. John D. Campbell and Co., 624 S.W.2d
728, 731 (Tex.App.--Fort Worth 1981, no writ).
            The Texas Rules of Civil Procedure also permit a party to move for a no-evidence summary
judgment “without presenting summary judgment evidence,” but they require the moving party to
“state the elements as to which there is no evidence.” Tex.R.Civ.P. 166a(i); Aguilar v. Morales, 162
S.W.3d 825, 834 (Tex.App.--El Paso 2005, pet. denied). The burden then shifts to the non-movant
to produce summary judgment evidence raising a genuine issue of material fact regarding each
element challenged in the motion. Aguilar, 162 S.W.3d at 834.
             A no-evidence motion for summary judgment is essentially a pretrial directed verdict, and
we apply the same legal sufficiency standard of review. King Ranch, Inc. v. Chapman, 118 S.W.3d
742, 750-51 (Tex. 2003), cert. denied, 541 U.S. 1030, 124 S.Ct. 2097, 158 L.Ed.2d 711 (2004). We
view the evidence in the light most favorable to the non-movant, and we must disregard all contrary
evidence and inferences. Id. at 751. A genuine issue of material fact is raised if the non-movant
produces more than a scintilla of evidence regarding the challenged element. Id. There is not a
scintilla of evidence when the evidence is so weak as to do no more than create a mere surmise or
suspicion of material fact. Ianni v. Loram Maintenance of Way, Inc., 16 S.W.3d 508, 513
(Tex.App.--El Paso 2000, pet. denied). Evidence that fails to constitute more than a mere scintilla
is, in legal effect, no evidence at all. Lozano v. Lozano, 52 S.W.3d 141, 148 (Tex. 2001).
STATUTES OF LIMITATIONS
            In Issue One, Doe contends a genuine issue of material fact exists as to whether his claims
are barred by limitations. First, we address his argument that duress applies to toll the statute of
limitations. Next, we consider his contention that the doctrine of unsound mind tolls limitations. 
Finally, we will address his claim that a fact issue exists as to whether the doctrine of equitable
estoppel applies, precluding Appellees from asserting limitations as a defense. 
            A cause of action generally accrues at the time when facts come into existence authorizing
a claimant to seek a judicial remedy. Murray v. San Jacinto Agency, Inc., 800 S.W.2d 826, 828
(Tex. 1990). In Texas, a plaintiff’s cause of action accrues, and the applicable limitations period
starts to run, “when a wrongful act causes some legal injury, even if the fact of injury is not
discovered until later, and even if all resulting damages have not yet occurred.” S.V. v. R.V., 933
S.W.2d 1, 4 (Tex. 1996). This is true even in sexual abuse cases. See id. at 22. However, when a
plaintiff is under eighteen years of age at the time an injury occurs, he is under a legal disability for
limitations purposes. See Tex.Civ.Prac.&Rem.Code Ann. § 16.001(a)(West 2002). In such cases,
claims for injuries suffered during childhood are deemed to accrue on the plaintiff’s eighteenth
birthday. See id. at § 16.001(b).
            The determination of when a cause of action accrues is a question of law. Moreno v. Sterling
Drug, Inc., 787 S.W.2d 348, 351 (Tex. 1990). Here, Doe’s claims include negligence, breach of
fiduciary duty, and intentional infliction of emotional distress against Msgr. Rowland and vicarious
liability and negligence against the Diocese. Ordinarily the two-year personal injury statute of
limitations applies to negligence and intentional infliction of emotional distress claims, and claims
for breach of fiduciary duty are governed by a four-year statute of limitations. See Tex.Civ.Prac.&
Rem.Code Ann. §§ 16.003(a); 16.004(a)(5)(West 2002); see Tex.Civ.Prac.&Rem.Code Ann.
§16.051 (West 2008); Snyder v. Eanes Independent School Dist., 860 S.W.2d 692, 699 (Tex.App.--Austin 1993, writ denied). However, a five-year statute of limitations applies where the plaintiff
brings suit for personal injury caused by sexual assault or aggravated sexual assault.


 See
Tex.Prac.&Rem.Code Ann. §16.0045(a).
            It is undisputed that because Doe was a minor, his cause of action did not accrue until his
eighteenth birthday on January 4, 1966. See Tex.Prac.&Rem.Code Ann. §16.001(a)(1). He did
not file suit until June 2006, more than forty years later. Regardless of which limitations provision
applies, absent an applicable tolling provision, limitations ran on or before January 4, 1971. 
DURESS
            The first question is whether a genuine issue of material fact exists with respect to whether
the threats made by Msgr. Rowland and Father Hay, during and immediately after the sexual
assaults, constitute duress sufficient to prevent Doe from timely filing his suit. 
            Doe submitted summary judgment evidence from Father Doyle, Dr. Benkert, and Dr. Foote. 
Both Father Doyle and Dr. Benkert have long studied the concept of duress in a religious context. 
Together the two published an article on the psychological impact on victims of clergy sexual abuse. 
They explained the concept of religious duress as similar to ordinary duress in that it involves some
improper conduct which is intended to, and does, interfere with a person’s free will and judgment. 
However, religious duress involves an internal constraint or threat experienced by people due to their
beliefs. 
            According to Dr. Benkert, she was asked to render an opinion concerning the potential role
of religious duress in John Doe’s inability to come forward regarding his sexual abuse prior to 2006
when he filed his lawsuit. Although she never met with or personally evaluated Doe, she reviewed
several of his personal records before preparing her report. Dr. Benkert rendered the following
opinions: 
All the elements of Religious Duress are manifested in the case of [Doe]. He was an
adolescent from a pious and religious Roman Catholic family that viewed the priest
as above reproach--completely trustworthy. They allowed their son to spend time
with the priests at their parish church where he served as an altar boy several times
a week. [Doe] trusted the priests of the parish and initially trusted Fr. Hay until he
sexually abused and betrayed him. He then became fearful. When he reported the
abuse to the pastor who still merited his confidence he was told to be quiet or you
will get yourself into hot water. [Doe] felt he had nowhere to turn and he was
overwhelmed and constrained out of mortal fear to follow Fr. Rowland’s admonition. 
[Doe] had been warned and threatened by the priest who held the power of heaven
and hell in his hands not to tell anyone about the abuse. This warning carried with
it not simply the power of a person, but the validation of a clerical culture--a reality
too powerful to resist. The resulting fear, awe, and respect of all Catholic clergy with
their special religious and social status within his Catholic experience makes
religious duress possible and effective. [Emphasis in original].
 
It is my professional opinion that [Doe] is the victim of Religious Duress. In my
experience, it takes many years of therapy and/or personality growth and
development to overcome the constraints and fear that keep such a person from
coming forward to acknowledge their sexual abuse. Most men and women who were
abused as minors by priests can never come forward publicly. It took many years of
professional help before [Doe] could even acknowledge the abuse to a therapist. It
took several more years before he was psychologically able to acknowledge it
publicly. These are all effects of Religious Duress.



            Dr. Foote, a forensic and clinical psychologist, evaluated Doe at the request of Doe’s
attorney for the purpose of determining “the presence of emotional problems . . . which may have
been related to events which occurred when he was a child.” According to Dr. Foote’s evaluation: 
[Doe’s voluntary return to the apartment after the first instance of abuse] started for
him ‘the myth of complicity,’ in which he believed himself to be an active
accomplice in his abuse. The sense that he is complicit in his own abuse has
augmented his sense of shame and has made it so shameful for him that he has never
even told his wife of some 35 years about his sexual abuse experience. Even though
he has been in treatment with mental health professionals, he had not disclosed this
abuse to them until 2004. 
 
This case is complicated by [Doe’s] history of being raised in a home in which there
was significant domestic violence. . . . This history of abuse made him even more
vulnerable to sexual exploitation by a priest. His expectation was that the priest
would be a benign adult who would take care of him and treat him with respect rather
than making him an object of sexual abuse. 
 
At the time of this evaluation, [Doe] shows continuing evidence of a Major
Depressive Disorder, which first became evident in about 1997. [Doe] dates this
emergence of depression to the death of his mother along with his memories of his
abuse experiences. If one assumes that he was sexually abused by Father Hay, it is
my professional opinion that [Doe’s] reduced self image, constant concern about
being homosexual and other self-deprecatory ideas mark his depression as a result
of this sexual abuse.
 
In addition, [Doe] shows some elements of a post-traumatic stress disorder. 
Although he would probably not meet the criteria for full PTSD . . . If one assumes
that his allegations of abuse by Father Hay are true, the post-traumatic symptoms are,
in my professional opinion, causally related to this experience of clergy sexual abuse.
            Next, Dr. Foote set out five factors leading to delayed disclosure of the sexual abuse. First,
Doe felt responsible for what happened. His “self-blame” was increased by his fear that his
participation meant he was homosexual. Doe knew what Father Hay did to him was wrong in a
moral sense. He attempted to prevent it from happening again by reporting it to Msgr. Rowland, but:
This report resulted in his being told that he should tell no one. If this event is true,
the sole individual to whom this child believed he could report the abuse used his
authority to instill greater fear into this child and to silence him. [Doe] recalls some
degree of relief that the supervising priest did not tell his father about the report. 

Fourth, Doe’s childhood fear of punishment from his father, were he to tell him about the abuse
prevented him from coming forward. Finally, “because his shame and fear prevented him from
reporting his abusive experience to medical and mental health professionals, his problems were
variously diagnosed as having other etiologies, and treated accordingly. This failure to pair his abuse
with the resulting post-traumatic and depressive symptoms also effectively prevented him from
pairing a tort with its damages. Without that pairing, seeking legal remedies for his distress made
no sense.”
Applicable Law
            Generally, duress is any coercion, whether mental, physical, or otherwise, which causes
another person to act contrary to his or her own free will or to submit to a situation or a condition
against his or her own volition or interest. Pierce v. Estate of Haverlah, 428 S.W.2d 422, 425 
(Tex.Civ.App.--Tyler 1968, writ ref’d n.r.e.). Stated differently, duress is the deprivation by one
person of another by putting the other in fear, in order to obtain some valuable advantage from the
other. Gray v. Freeman, 37 Tex.Civ.App. 556, 84 S.W. 1105, 1107-08 (1905). To constitute duress,
the threat must be of such character to overcome the willpower of a person and cause them to do
what he or she otherwise would not. 
            In actions based on duress, the operation of the statute of limitations is tolled until the time
that duress ceases to exist. See Pierce, 428 S.W.2d at 422; McNeil v. Lovelace, 529 S.W.2d 633,
636-37 (Tex.Civ.App.--Fort Worth 1975, no writ). Upon removal of the duress, the statute begins
to run. McNeil, 529 S.W.2d at 637. 
            The question of what constitutes duress is a matter of law. Pierce, 428 S.W.2d at 425. 
However, the question of whether duress exists in a particular situation is generally a question of fact
dependant upon all the circumstances and the mental effect on the party claiming duress. Id. 
Application of Law to Facts 
            To defeat summary judgment based on duress, Doe must demonstrate by more than a scintilla
of evidence that the statements by Father Hay or Msgr. Rowland deprived him of his free will and
judgment and that the duress consistently prevented him from bringing his claim from the time he
reached eighteen until he filed suit in June 2006. Doe points to two improper threats which robbed
him of his ability to take legal action: (1) Father Hay’s statements that he was the Son of God and
that everything he touched was sacred; and (2) Msgr. Rowland’s instructions to keep quiet or Doe
would get in trouble. Doe reasons that these threats were made under the reverential authority
afforded to priests in an effort to make sure he never pursued a claim. In other words, the duress
occurred because of the exploitation of the priests’ authority.
            Doe relies on the testimony of Father Doyle and Dr. Benkert.


 Based on the expert reports,
Doe claims he suffered a specific type of duress identified as “religious duress.”


 He suggests that
duress in a religious context is similar to ordinary duress but it involves “an internal constraint or
threat experienced by people due to beliefs.” According to Doe, the constraint on a person’s free will
that comes from religious duress is based on two elements: 
(1) the objective or general level of Church teaching which the individual
experiences through various levels of religious education, participation in religious
rituals or liturgies and living in a Catholic-based culture, and 
 
(2) the direct experience of the individual with priests or bishops whose words or
actions have caused the person to believe that the religious figure had power over
them.

            Doe points to the following facts in support of his religious duress claim. He was raised in
a devout Catholic family. His father was very strict and deeply religious. Doe was an altar boy
which was a status honoring his family. His family believed the Church’s teachings that priests and
bishops were superior, they had a duty to obey them, and that to disobey a clergy member could
constitute a mortal sin. In his brief, Doe also maintains that Catholic children are taught from an
early age that clerics are special, unique, removed, powerful and deserving of deference, awe, and
unquestioned respect. 
            Doe is using this theory of religious duress to create a fact issue as to whether, because of
his view of the priests and his religious beliefs, the threats sufficiently deprived him of his free will
thereby tolling limitations. Even if we assume that a genuine issue of material fact exists with
respect to whether the threats made by Msgr. Rowland are sufficient to meet the definition of duress,
Doe must still demonstrate that the threats were of such a continuous nature as to prevent him from
filing suit within the applicable limitations period. See Pierce, 428 S.W.2d at 422. We find no such
evidence. Doe’s allegation of a subjective fear that some retaliation might occur based on his
religious beliefs is insufficient to establish duress. See Smith v. Estate of Kelly, 343 N.J.Super. 480,
778 A.2d 1162, 1173 (N.J.Super.A.D. 2001)(“Duress may take the form of moral compulsion or
psychological pressure. Yet, even moral compulsion or psychological pressure are not wrongful
unless they are ‘so oppressive under given circumstances as to constrain one to do what his free will
would refuse.’” [Internal citations omitted.]). Doe must not only demonstrate some act or threat by
Appellees that prevented him from exercising his legal rights, but also that the threatening behavior
continued on into his majority. Doe failed to present any evidence that the duress continued
throughout the forty years it took him to file suit. With respect to the threat by Msgr. Rowland, Doe
describes only one encounter, which is insufficient to show the threat was continuous in nature. See
Pierce, 428 S.W.2d at 427. Similarly, Doe had no contact with Father Hay after he stopped serving
mass with him. Doe left the church in 1972. After his father’s death in 1996, Doe would have
logically overcome the fear of retaliation based on his father’s religious beliefs. Doe offers no
explanation as to the duress he experienced between his father’s death and when he consulted the
first attorney in 2003, or filed his lawsuit in 2006, nor has he named the event that enabled him to
overcome the duress he experienced. See Doe v. Holy See, 17 A.D.3d 799, 800, 793 N.Y.S.2d 571
(N.Y.App. 2005)(plaintiff’s argument that the statute of limitations should be tolled based on a
doctrine of “religious duress” is untenable both because he failed to show that the claimed duress
continued after he reached the age of majority and because our recognition of the doctrine, grounded
in the teachings of the Catholic Church, would require us to venture into forbidden ecclesiastical
terrain); see also Estate of Kelly, 778 A.2d at 1175 (“The question is what did defendants do to
prevent plaintiff from asserting that claim against them upon reaching age eighteen. . . . The answer
is nothing.”). We conclude there is no genuine issue of material fact concerning duress. 
UNSOUND MIND
            The law provides that a person of unsound mind is under a legal disability which tolls the
statute of limitations. See Tex.Civ.Prac.&Rem.Code Ann. §§ 16.001, 16.003; see Grace v.
Colorito, 4 S.W.3d 765, 769 (Tex.App.--Austin 1999, pet. denied). Here, Doe argues a fact issue
exists as to whether limitations is tolled under Texas Practice and Remedies Code, Section 16.001
“because he was emotionally and mentally incapacitated and of an unsound mind to bring suit
against [the Diocese and Rowland] at the time the causes of action accrued.” Texas Civil Practice
and Remedies Code Section 16.001 provides in relevant part:
(a) For the purposes of this subchapter, a person is under a legal disability if the
person is: 

. . .
 
(2) of unsound mind. 
 
(b) If a person entitled to bring a personal action is under a legal disability when the
cause of action accrues, the time of the disability is not included in a limitations
period. 
Tex.Civ.Prac.&Rem.Code Ann. § 16.001. The purpose of Section 16.001(a)(2) is to protect a
person of unsound mind by insuring that a legally disabled person’s right to bring suit will not be
precluded by a statute of limitations, prior to removal of the disability. Ruiz v. Conoco, Inc., 868
S.W.2d 752, 755 (Tex. 1993). The tolling provision applies to a person who suffers from an inability
to participate in, control, or understand the progression and disposition of their lawsuit. Id. 
Although generally speaking, persons of unsound mind and insane persons are synonymous, a person
may be of unsound mind without having been adjudicated incompetent. Hargraves v. Armco Foods,
Inc., 894 S.W.2d 546, 547 (Tex.App.--Austin 1995, no writ).
            When the non-movant asserts a tolling statute (such as Section 16.001) in response to a
motion for summary judgment, the limitations defense is not conclusively established until the
movant negates the applicability of the tolling provisions. See Hargraves, 894 S.W.2d at 547. In
other words, Doe must prove that he was of unsound mind during the relevant time period. See
Wagner v. Texas A & M University, 939 F.Supp. 1297, 1317-18 (S.D.Tex. 1996)(“It is the plaintiff’s
burden to show that he is of unsound mind and to demonstrate when such period of disability ended,
if not ongoing.”).
            On appeal, the Diocese and Msgr. Rowland each argue that the only evidence relevant to this
issue is contained in the affidavit of Dr. Charles Clark which concludes that Doe was not of unsound
mind. The Diocese also argues that Doe’s own experts do not support his contention because: (1)
Dr. Benkert’s affidavit affirmatively states Doe was not of unsound mind; and (2) Dr. Foote’s
testimony fails to state Doe was of unsound mind.
            Doe acknowledges that Dr. Benkert’s affidavit states that Doe is not of unsound mind. But
he counters that her opinion relates to his present condition and emphasizes that she did not state that
he was never of unsound mind. Doe also maintains that Dr. Foote’s report directly addressed
whether Doe formerly suffered from unsound mind and noted that he was unable to even report the
abuse until 2004. Finally, Doe recognizes the opinions of Dr. Clark and Dr. Foote are in conflict,
but he contends that the contradiction only provides further support for his argument that the issue
of unsound mind cannot be resolved as a matter of law.
            The unsound-mind exception tolls the general statute of limitations for two reasons: first, 
to protect persons without access to the courts, and second, to protect persons who are unable to
participate in, control, or understand the progression and disposition of their lawsuit. Hargraves,
894 S.W.2d at 548. To prevent summary judgment, the non-movant needs to produce specific
evidence that would enable the court to conclude that he did not have the mental capacity to pursue
litigation for a definite period of time, or produce a fact-based expert opinion to that effect. See
Grace, 4 S.W.3d at 769; Porter v. Charter Medical Corp., 957 F.Supp. 1427, 1438 (N.D.Tex. 1997);
Freeman v. American Motorists Ins. Co., 53 S.W.3d 710, 713 (Tex.App.--Houston [1st Dist.] 2001,
no pet.).
            On appeal, Doe’s entire argument rests on Dr. Foote’s report. According to Dr. Foote, a
number of factors “combined to result in [Doe’s] inability to go forward with this litigation.” 
            • Doe felt responsible for what happened; 
            • Doe feared that his participation was a sign he was homosexual; 
            • the fear instilled in him by Msgr. Rowland after reporting the abuse; 
            • fear of his father; and 
• fear and shame which prevented him from reporting the abuse to medical and mental health
professionals. 

            The report fails to mention when this disability began and certainly does not address whether
Doe was incapacitated at the time the cause of action accrued. Doe testified that he had no issues
with depression, concentration, or nightmares until his mother passed away in1996, some thirty years
after the cause of action accrued. Since Doe attained majority, he served in the Army and received
awards for his service; he worked, including one job which lasted for eleven years; he earned an
associates degree from El Paso Community College and attended several classes at UTEP, he has
been married to the same woman since 1972, and he has five children. All of these actions tend to
show Doe was of sound mind. Finally, the only other reference to Doe’s unsound mind is the
testimony of Dr. Clark and Dr. Benkert, both of which specifically state that Doe is not legally
incapacitated. 
            Even taking Doe’s assertions as true, which we must, the evidence fails to rise to the level
of incapacity required under the doctrine of unsound mind. We thus conclude that Doe presented
no evidence showing that during this relevant period he was somehow incapable of participating in
and controlling a law suit. See Grace, 4 S.W.3d at 770; see also Doe v. Henderson Independent
School Dist., 237 F.3d 631, 2000 WL 1701752, at *5 (5th Cir. 2000)(noting that Texas courts have
generally denied tolling based on the unsound mind theory where a plaintiff is able to assert his legal
rights, the Fifth Circuit affirmed the district court’s decision denying tolling on this basis, noting that
the plaintiffs had held down jobs, been married, and participated in legal proceedings). 
EQUITABLE ESTOPPEL
            Finally, we address Doe’s contention that he raised a fact issue as to whether the Appellees
were equitably estopped from asserting limitations as a defense. The Diocese and Msgr. Rowland
argue that equitable estoppel does not apply, primarily relying on the fact that through Doe’s own
admission, he never forgot the assaults. 
            The doctrine of equitable estoppel requires (1) a false representation or concealment of
material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention
that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the
facts; (5) who detrimentally relies on the representations. Johnson & Higgins of Texas, Inc. v.
Kenneco Energy, Inc., 962 S.W.2d 507, 515-16 (Tex. 1998); Dean v. Frank W. Neal & Associates,
Inc., 166 S.W.3d 352, 357-58 (Tex.App.--Fort Worth 2005, no pet.). Estoppel in avoidance of
limitations may be invoked in two ways: a potential defendant conceals facts that are necessary for
the plaintiff to know he has a cause of action; or, the defendant engages in conduct that induces the
plaintiff to forego a timely suit regarding a cause of action that the plaintiff knew existed. Rendon
v. Roman Catholic Diocese of Amarillo, 60 S.W.3d 389, 391 (Tex.App.--Amarillo 2001, pet.
denied); Dean, 166 S.W.3d at 358. On appeal, John Doe argues the latter applies. 
            To raise a fact issue on his estoppel conduct claim, Doe must have presented some evidence
that the Appellees’ conduct affirmatively induced him into delaying suit beyond the limitations
period, and that such delay in filing was not due to any want of diligence on Doe’s part. See Rendon,
60 S.W.3d at 391; Ladd v. Knowles, 505 S.W.2d 662, 669 (Tex.Civ.App.--Amarillo 1974, writ ref’d
n.r.e.). “Implicit in this test are the requirements that the plaintiffs knew they had a cause of action,
that the cause of action had accrued at the time the inducement occurred, and that their initial and
continued reliance upon the original inducement was reasonable.” Dean, 166 S.W.3d at 358 citing
Rendon, 60 S.W.3d at 391. Otherwise stated: 
[T]o estop defendant, he must have done something that amounted to an affirmative
inducement to plaintiff to delay bringing the action. Statements calculated to
dissuade a litigant from beginning action and not designed merely to induce its
postponement will not, in the absence of fraud, estop the party making them from
availing himself of the plea of the statute of limitations in the event of subsequent
prosection [sic] of such action.

See Squyres v. Christian, 253 S.W.2d 470, 472 (Tex.Civ.App. 1952), quoting 53 C.J.S., Limitations
of Actions, s 25, p.966.
            In Rendon, children allegedly molested by a Catholic priest sued based on one bishop’s
failure to take action against the priest. Rendon, 60 S.W.3d at 389. The Amarillo Court rejected the
plaintiff’s assertion of estoppel as a defense to the statute of limitations where the bishop represented
to the victims’ father that he would “take action to take care of the matter,” and that “the Church
would take care of the Boys, protect the other children from [the abusive priest], and that legal action
would be unnecessary.” Id. at 390-91. In affirming the trial court’s summary judgment, the court
noted that: 
Without evidence that anything more than the mere disclosure of criminal conduct
occurred between [the victims’ father] and [the Bishop], without reference to a
discussion about a claim, suit, redress or compensation of any kind, we lack
sufficient evidentiary foundation from which to reasonably infer that a promise to
‘take action’ comprised inducement to delay initiation of a civil suit. [Emphasis in
original.]

Rendon, 60 S.W.3d at 392. 
            Neither Father Hay’s claim that he was God nor the warning by Msgr. Rowland is sufficient
to delay suit beyond the applicable statutory periods of limitation. See Rendon, 60 S.W.3d at 392;
see also Squyres, 253 S.W.2d at 472 (statements calculated to dissuade a litigant from beginning
action and not designed merely to induce its postponement will not, in absence of fraud, estop the
party making them from availing himself of the plea of the statute of limitation). None of the alleged
threats reference civil action, redress, or compensation. Doe admits he had knowledge of the facts
giving rise to his claims. In fact, he knew the abuse was wrong when it happened and he has never
forgotten it. Consequently, equitable estoppel does not apply. See Doe v. Linam, 225 F.Supp.2d
731, 736-37 (S.D.Tex. 2002). 
            We overrule Issue One and affirm the judgment of the trial court. 
 
 
 
September 21, 2011                                                    
                                                                                    ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, J., and Gomez, Judge
Gomez, Judge, sitting by assignment